No. 86,322

STATE OF KANSAS, *Appellee*, v. DAVID A. MONCLA, *Appellant*.

(46 P.3d 1162)

Opinion filed May 31, 2002.

*Darla J. Lilley*, of Lawrence, argued the cause and was on the brief for appellant.

*David A. Moncla*, appellant, was on a supplemental brief pro se.

*Debra S. Peterson*, assistant district attorney, argued the cause, and *Lesley A. Isherwood*, assistant district attorney, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is David A. Moncla's third appeal from his conviction of first-degree murder, K.S.A. 21-3401. His conviction was affirmed in *State v. Moncla*, 262 Kan. 58, 936 P.2d 727 (1997) (*Moncla I*). He later moved for a new trial under K.S.A. 22-3501 based on newly discovered evidence. Moncla advanced two affidavits from prison inmates in support of his motion. The affidavits showed that another person admitted involvement in and/or knowledge of the murder for which Moncla was convicted. The district court conducted a nonevidentiary hearing, heard arguments, and summarily denied the motion. Moncla appealed. Finding that the district court abused its discretion in denying the motion without evaluating the credibility and materiality of paper evidence, we reversed and remanded for further proceedings. See *State v. Moncla*, 269 Kan. 61, 4 P.3d 618 (2000) (*Moncla II*). After conducting

an evidentiary hearing, the district court again denied Moncla's new trial motion.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (conviction for an off-grid crime). The single issue is whether the district court abused its discretion by again denying Moncla's motion for a new trial.

Finding no error, we affirm.

## FACTS

We repeat the facts from *Moncla II,* to set the stage for our disposition here.

"Moncla received a 'hard-40' sentence for the murder of Diane Swinney. See K.S.A. 21-4638. Swinney died after sustaining 18 blows to the head with a hammer. An employee of Swinney's named Kevin Robertson discovered her body. Swinney owned a bar. She lived just a few blocks away from her bar in the upstairs apartment of a home. Moncla and two other individuals had been staying at the home. Moncla sometimes slept on a recliner in Swinney's room. On the night of her death, Swinney closed her bar around 2 a.m. The next morning Moncla left Swinney's house on foot. He told one of the other house occupants he was late for work. He also said Swinney was having sex with someone and he did not wish to watch. Moncla went to John Bayliff's house. He told Bayliff he was awakened that morning by a man hitting him over the head with a gun. According to Moncla, three men were in the room. Moncla was pushed into a bathroom. He could not see Swinney, but heard several slaps or hits and heard someone say, '[W]e're going to have to take a loss on this one.' *Moncla,* 262 Kan. at 62. He also heard the name Kevin. After the men left, Moncla went into the bedroom and saw Swinney on the floor. She was beaten up, crying, and holding a pillow over her head. Swinney told Moncla to 'stay out of it,' so he left. 262 Kan. at 62. Bayliff related this story at trial."

"In Moncla's direct appeal, his defense was described as follows:

'The defendant testified on his own behalf and claimed that others had committed the crime. He presented evidence of Swinney's mounting debts to suggest a motive. He also attacked the police investigation as inadequate in following up leads on other suspects. The defendant claimed that Robertson, the man who found the body, was involved in the murder and that a man named Danny Long committed the murder. The police had received a Crime Stopper tip on Long. In addition, Robert Wisley, a friend of Long's, testified that Long approached him in a bar and confessed to Swinney's murder, specifying that he used a hammer to do it.' 262 Kan. at 63.

"Moncla filed a motion for new trial based on affidavits from Scott Staggs and Allen Richards, two inmates at the El Dorado Correctional Facility. Staggs stated

that he was a cellmate with Robertson at El Dorado, during which time Robertson claimed to be involved in the death of Swinney. According to Staggs, Robertson specifically admitted being with Swinney on the night of her death. Robertson told Staggs he was there 'partying' with his brother. Robertson and his brother asked Swinney for some 'dope.' When Swinney did not comply, they began to threaten her, and soon Robertson's brother hit Swinney in the head with a hammer. The brother continued to hit Swinney about 18 times. The two then put a pillow over Swinney's head. They washed their hands in the kitchen sink and left through the back door.

"In the second affidavit, Allen Richards explained that he met Robertson in the El Dorado infirmary while Robertson was recovering from knee surgery. According to Richards, Robertson said he knew of the Swinney murder and how the police had put the wrong man in jail. Robertson said there was no way Moncla could have committed the murder. Richards believed Robertson was suggesting that he had committed the crime. Then Robertson explained to Richards that he had used a hammer as his weapon and that Swinney had died from being hit in the head. When Robertson realized that Richards knew Moncla, the discussion ended." 269 Kan. at 62-63.

## The Hearing

At the second hearing on the motion for a new trial, the hearing from which Moncla now appeals, the district court heard testimony from several witnesses, including Scott Staggs and Allen Richards, the two inmates furnishing the affidavits.

### Staggs' testimony

According to Staggs, he first encountered Robertson in the Sumner County jail, not in the El Dorado Correctional Facility (El Dorado). Staggs thought he and Robertson were in the jail together in 1994. According to Staggs, Robertson discussed Swinney's murder for several days and said he and his brother, Billy Robertson, went to Swinney's house to get drugs. According to Staggs, Robertson said they robbed Swinney because they did not have money for the drugs. Robertson claimed that his brother then hit Swinney with a hammer. Staggs testified Robertson said that he testified against the man who was ultimately convicted, but Robertson never identified Moncla by name during the conversations. Robertson's alleged version of events included Robertson hitting Swinney in the face, and his brother, Billy, hitting her in the head with a hammer. They allegedly dragged her body into the bedroom, clubbed

her roughly 18 times, put a pillow over her head, took the drugs, and left.

Staggs testified that 4 years later, while he was incarcerated at El Dorado, he learned through a fellow inmate that Moncla was the individual allegedly set up by Robertson. Staggs drafted a letter to two detectives and to the Chief Appellate Attorney for Sedgwick County, in which he notified them of what he had heard from Robertson. During his time at El Dorado, Staggs was assigned to push Robertson's wheelchair in the infirmary and, thus, again met Robertson.

On cross-examination, Staggs acknowledged some discrepancies between the information he originally reported and his testimony at the evidentiary hearing. He testified that in his letter to the authorities, he said Robertson was responsible for the murder, but in the affidavit provided to the public defender's office, Staggs said Robertson's brother was the one who hit Swinney in the head. Staggs denied ever having a falling out with Robertson while they were together at the Sumner County jail.

### Richards' testimony

Richards was incarcerated at El Dorado with Staggs and Moncla. Richards was kept in the same cell house with Moncla in 1996. Richards testified at the evidentiary hearing that he worked in the infirmary when Robertson was recovering from surgery. According to Richards, he overheard a conversation between Robertson and another inmate. Robertson said he did not know how "Dave (Moncla) got found guilty" because Robertson was "the only person that knew what type of weapon was used." Richards said Robertson "used David's first name and last name."

Richards testified that the Swinney murder was the topic of conversation for 6 or 7 days after Moncla was sent to the Lansing State Penitentiary. Richards acknowledged that he was acquainted with Moncla at the time he overheard the conversation, but he did not realize Moncla was incarcerated for a homicide. During cross-examination, Richards acknowledged that he never had a face-to-face conversation with Robertson.

*Moncla's testimony*

Moncla also testified at the evidentiary hearing. He said he never had direct contact with Staggs. When asked if he was aware of Staggs' letters and meetings with the public defender's office, Moncla said he was made aware of them after the fact. Moncla testified that he knew Richards from the El Dorado Correctional Facility. At the end of his cross-examination, Moncla testified that Swinney was alive when he left. Moncla said he was not sure if the others were gone when he left. He said they still could have been in the house for all he knew. When asked if they were still in the bedroom upstairs, Moncla said, "No, they went downstairs."

*Chief investigator's testimony*

Kevin Barnes, the chief investigator at El Dorado, testified that Moncla, Richards, and Staggs were housed in the same cell house and cell block for periods of time.

*Robertson's testimony*

Robertson also testified at the evidentiary hearing. According to Robertson, he and Staggs spent about 3 weeks together at the Sumner County jail. Robertson said that when he was in the infirmary at El Dorado, Staggs came to him and asked him about Moncla's case. Robertson told Staggs that he had found his friend's body and that Moncla supposedly killed her.

Contrary to Staggs' testimony, Robertson testified that he had "all kind of problems" with Staggs at the Sumner County jail. The two men "got in to words" one day, and the guards moved Robertson across the hall from Staggs. When Staggs was in the cell across the hall he would spit and throw things into Robertson's food tray. Robertson said Staggs did everything he could to irritate Robertson. All of this happened before Staggs became Robertson's wheelchair attendant.

When asked if he knew Richards, Robertson replied, "Not really." He denied telling Richards anything about Swinney's murder. He also denied having a "trust relationship" with Staggs and knowing Moncla at the time of the murder. When asked if he had ever seen Moncla or met him before, Robertson said, "I think one time

at the bar. I don't know for sure." At El Dorado, he saw Moncla pass by. After that, Robertson started getting threats and "everybody was saying [Robertson] was a snitch." According to Robertson, Moncla allegedly showed paperwork to inmates that said Robertson was a snitch. Robertson found out through a detective that Staggs and Richards claimed he had confessed the murder to them.

After hearing arguments and considering the testimony, affidavits, and trial evidence, the district court denied Moncla's motion for a new trial. The district court found that "the evidence involved here is not material enough that would raise a reasonable possibility of a different finding at another trial."

## DISCUSSION

The same district judge presided at Moncla's trial and at the K.S.A. 22-3501(1) hearing. Moncla argues that the district court abused its discretion by denying his motion for a new trial. We disagree.

Our standard of review of an order denying a K.S.A. 22-3501(1) motion for a new trial is generally limited to whether the district court abused its discretion. Under the abuse of discretion standard, if a reasonable person could agree with the district court's decision, it will not be disturbed on appeal. *State v. Thomas*, 257 Kan. 228, 229, 891 P.2d 417 (1995). The rules governing motions for new trials based on newly discovered evidence are well established. See *Moncla II*, 269 Kan. at 64-65. K.S.A. 22-3501(1) provides in pertinent part:

"The court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . . A motion for a new trial based on the ground of newly discovered evidence may be made within two years after final judgment."

The district court discounted the hearing testimony and affidavits of Staggs and Richards. It found that each affidavit was suspect. The district court noted that Staggs' affidavit contained allegations "that certain conversations occurred in regard to this murder prior to the murder having . . . occurred." It also noted that Staggs' testimony conflicted with his affidavit.

At the hearing, Staggs testified that his affidavit incorrectly showed that he was cellmates with Robertson in El Dorado (that

was in 1996, after the murder). Instead, Staggs said they were cell-mates in Sumner County jail (that was in 1994, before the murder). Staggs initially testified that his conversations with Robertson about the Swinney murder took place in the Sumner County jail in 1994. In addition, in Staggs' affidavit he said Robertson told him that Swinney's murder took place on July 15, 1995. The record shows that the murder took place on January 16, 1995, and that Moncla was charged with first-degree murder on February 1, 1995.

The district court also found inconsistency in the affidavit and testimony of Richards regarding his personal knowledge. In Richards' affidavit, Richards said that Robertson told him how he used the hammer and how the victim died. The affidavit also said Robertson immediately avoided the subject of Swinney's death when Robertson realized that Richards knew Moncla. However, Richards testified that he had *overheard* conversations that Robertson had with other inmates about the murder.

Finally, the district court found: (1) the evidence at trial pointed to Moncla's guilt, and (2) at best, the affidavits and testimony of Staggs and Richards only suggested that there were two people involved. Staggs' hearing testimony named Robertson and his brother as Swinney's murderers. Moncla had testified at trial that three other people, including Robertson, were in Swinney's bedroom on the night of the murder. However, according to Moncla, after the perpetrators left, Swinney was beaten up but still alive. He testified at trial that she asked him to "stay out of it," so he left her and left the house.

The testimony of Staggs and Richards fails to explain how, if Moncla was removed from the situation, blood was detected on his jeans in a spatter pattern, which was consistent with the type of action that would create impact-type stains. The authorities were unable to identify the blood on Moncla's jeans as Swinney's because gasoline had been spilled on his jeans. While there was evidence that Swinney's head was covered, the forensic expert testified that Swinney received "some of the blows . . . without any type of covering on her head." See *Moncla I*, 262 Kan. at 62-63. There were three small blood spatter stains on the bathroom floor

where Moncla claimed he was held at gunpoint. All of this evidence was presented to the jury.

The jury heard Moncla's testimony at trial regarding Robertson's alleged connection to the crime. Robertson was also called to testify. When Moncla saw Robertson, Moncla asserted that he recognized him and his voice as the man who held him at gunpoint on the night of Swinney's murder. Robertson had worked with Swinney at the bar. He had an alibi witness for the night of the murder. The alibi witness testified that on the night of January 15, 1995, she went to Star's Bar, where she talked to Robertson. They left the bar together around 1 or 2 a.m., and Robertson spent the night at her home.

We conclude that the district court did not abuse its discretion in denying Moncla's motion for a new trial.

Affirmed.