No. 90,318

STATE OF KANSAS, *Appellee,* v. JEARL W. ADAMS, JR., *Appellant.*
(124 P.3d 19)

Opinion filed December 9, 2005.

*Korey A. Kaul,* assistant appellate defender, argued the cause and was on the briefs for appellant.

*Darrin C. Devinney,* assistant county attorney, argued the cause, and *Jan Satterfield,* county attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is a direct appeal from defendant Jearl Adams' conviction of first-degree felony murder and his resulting life sentence for the death of 11-month-old Hailey O'Roke.

Adams raises seven issues: (1) whether the district judge erred in rejecting his motion for new trial; (2) whether the district judge erred in refusing to admit evidence of earlier child abuse allegations made against the victim's mother; (3) whether the district judge erred in allowing use of a PowerPoint exhibit as a demonstrative exhibit explaining Shaken Baby Syndrome without giving a cautionary jury instruction; (4) whether the district judge erred by failing to instruct on the lesser included offenses of second-degree murder and involuntary manslaughter; (5) whether the district judge erred in admitting autopsy photographs depicting Hailey's injuries; (6) whether the admission of Adams' confession at trial violated his Sixth Amendment right to confrontation; and (7) whether cumulative error deprived him of a fair trial.

We affirm.

## Factual Background

Adams was the husband of Hailey's daycare provider. Hailey was born on June 5, 2001. She was declared dead early on the morning of May 11, 2002, after being brought to the hospital the previous afternoon from the daycare site.

On May 9, 2002, Hailey's mother, Lori, had taken Hailey to the doctor because of vomiting and slight lethargy. The doctor diagnosed mild dehydration and noted that Hailey would need to be admitted to the hospital for fluid replacement if her condition did not improve within the next 24 hours.

The next day, Hailey arrived at daycare at Adams' home at approximately 9:45 a.m. Adams' wife, Rosie, described Hailey's behavior during that day as fussy, listless, clingy, and generally not like herself. Rosie was aware of Hailey's dehydration and tried to coax Hailey to drink and eat at various times; Hailey showed little interest in doing either. At approximately 2:30 p.m., Rosie gave Hailey liquid ibuprofen and laid her down on the floor of the living room.

When another daycare client arrived a short time later to pick up her child, she witnessed Adams holding and attempting to comfort Hailey, who was crying. When the client approached to pat Hailey on the back, Adams commented that Hailey did not like him (Adams) very much.

A short while later, Rosie went into a nearby laundry room with two of her children, leaving Adams, Hailey, and Adams' 3-year-old son in the living room. Shortly thereafter, Adams called out to his wife, saying something was wrong with Hailey. When Rosie entered the living room, Hailey was lying on the couch with Adams standing beside her. Hailey was not responsive and did not appear to be breathing, so Rosie instructed Adams to call 911.

When emergency medical technicians arrived at Adams' home, Hailey was not breathing and her heartbeat could not be detected. The technicians noticed no bruising on Hailey's head or face. They assessed her condition as cardiac arrest, inserted a breathing tube,

and transported her to the hospital. Adams asked to ride with Hailey in the ambulance.

Hailey was declared dead at 3:01 a.m. the next day.

Dr. Keith Kerr, who treated Hailey in the pediatric intensive care unit when she reached St. Francis Hospital in Wichita, ordered a CT scan. The results of the scan were "grossly abnormal," showing blood in several areas of brain matter. Kerr also found evidence of retinal hemorrhages in Hailey's eyes. A prominent bruise had developed on Hailey's forehead, and her pupils were fixed and dilated. Dr. Kerr testified that Hailey "probably either was very close to it or was brain dead on arrival" at the hospital.

The coroner later ruled Hailey's cause of death a homicide by blunt force trauma and noted evidence of acceleration and deceleration of the brain, typically associated with severe shaking. According to the coroner, Hailey's death was "not due to any accidental injury." The coroner ultimately testified that Hailey's injuries occurred approximately 12 hours before she was declared dead and that the injuries would have made her unconscious immediately after their infliction.

Dr. Michael Handler, a forensic neuropathologist who examined Hailey's body after her death, opined that Hailey's injuries were 10 hours to 14 hours old at the time she was declared dead, noting that "[t]he symptomology in this case would have immediately followed the assault" with "no conscious interval." Dr. Handler found no evidence of a "significant preexisting injury," and he said that dehydration could not have led to the conditions he observed.

Adams first told officials that, before the 911 call, Hailey had not been coughing or screaming; had not fallen, bumped, or run into anything; and had not been pushed, stepped on, or thrown. In his initial interview with Butler County Sheriff's officers early on May 11, before Hailey was pronounced dead, Adams said that, because Hailey had been lying on the floor near where his son was playing, Adams decided to pick her up and lay her on the couch. At about that moment, Hailey's head fell back; her eyes rolled backward; and she went limp, prompting him to call out for his wife.

Officers attempted to make a video recording of a second interview with Adams the evening after Hailey was declared dead, but a technical malfunction meant the interview was not recorded as planned. The officers ultimately testified Adams said that evening that he did not know what had happened to Hailey.

On May 14, 2002, Kansas Bureau of Investigation (KBI) Agent Ricky Atteberry interviewed Adams. During that interview, which was successfully recorded, Adams told Atteberry that a remote-controlled toy car operated by one of Adams' children may have hit Hailey in the head. Adams said he then picked up Hailey and accidentally dropped her. He then picked her up again and shook her to get her attention, because she was not responding and had a starry look in her eyes. Adams wrote out this sequence of events in a statement signed by himself and Atteberry. The portion of the statement having to do with shaking Hailey was added at the end of the statement; Atteberry acknowledged he may have told Adams that Adams must have shaken Hailey, something Adams eventually acknowledged having done.

Approximately an hour after the written statement was finished, Adams gave KBI officials another statement. In this statement, Adams said Hailey had been crying on the floor when he picked her up. Hailey's crying had made Adams mad; so he held her approximately level with his head and threw her hard onto the floor. He said he then picked her up and shook her to get her attention; then he called for his wife. Adams demonstrated this final version of events several times for the KBI officials. Atteberry testified that Adams' reason for throwing Hailey to the floor was to make the infant "mind."

The district judge ruled pretrial that Adams' statements to law enforcement were freely and voluntarily given and thus admissible at trial.

Just before the start of Adams' trial, the prosecutor met with each of Hailey's parents, Jerry and Lori O'Roke. The prosecutor had been in contact with both of them at various times before that point regarding Hailey's death and the progress of the case, and whether her office had provided victims' counseling, notice of hearings, and information about victims' compensation. The prosecu-

tor's conversations with Hailey's parents just before trial, however, concerned her knowledge that Jerry had been at the courthouse to file a restraining order against Lori, and that Lori, in response, had come to the courthouse to file a restraining order against Jerry.

In her conversation with Jerry, the prosecutor learned that the couple had been in conflict since Hailey's death. Neither Jerry nor Lori had accused the other of physical abuse. The prosecutor briefly looked over a Protection from Abuse Act (PFA) petition Jerry had filled out. The petition stated Lori had placed Jerry in fear of imminent bodily injury and that Lori had been "acting crazy," lying to family and friends, making threats to kill herself, screaming, and acting physically aggressive towards her husband.

The prosecutor told both Jerry and Lori that they needed to focus their attention on the upcoming trial. She also said that a restraining order could pose logistical problems, because the couple would not be able to be together in certain instances. She advised the O'Rokes of their options, encouraged them to seek counseling, and told them it was their choice as to whether they would continue to pursue the restraining orders. Yet, after talking to Jerry and Lori, the prosecutor told a court clerk that Jerry's petition might be withdrawn. It eventually was.

Before Adams' trial began, the defense was aware of Jerry's PFA petition and knew of its withdrawal. The defense was not aware the prosecutor had discussed the PFA filings with Jerry and Lori, and defense counsel made no effort to introduce evidence of the couple's conflict or Jerry's PFA petition during trial.

Several years before Hailey was born, Lori had been married to another man, with whom she had three children. One of Lori's daughters from that union had made allegations that Lori was physically, emotionally, and sexually abusive toward her children. Custody of the three children had been awarded to the children's father in the divorce decree, with Lori granted only supervised visitation. Evidence pertaining to the custody arrangements and the abuse allegations was proffered by the defense, but the district judge refused to admit it during Adams' trial. The defense also was unsuccessful in preventing use of a demonstrative PowerPoint

presentation explaining Shaken Baby Syndrome as well as admission of autopsy photographs.

After the trial was concluded and defense counsel learned of the prosecutor's conversations with Hailey's parents about the PFA filings, Adams filed a motion for a new trial. The district judge denied the motion, ruling the prosecution's failure to disclose the conversations pretrial did not result in a *Brady* violation. See *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). In the district judge's view, the fact that Jerry withdrew his PFA petition after talking with the prosecutor was neither material nor exculpatory.

### *Motion for New Trial*

Adams first contends that he should have been granted a new trial because the State's failure to disclose evidence of the prosecutor's conversations about the PFA filings with Hailey's parents left the defense without key information for Lori's cross-examination. Adams argues that his defense was to cast suspicion on Lori and that, had his defense counsel known of the prosecutor's possible role in persuading Jerry to dismiss his PFA filing, counsel would have questioned Lori about the PFA allegations. In Adams' view, the actual circumstances surrounding dismissal of the PFA filing would have carried more weight with the jury than if it simply had been dismissed without interaction between the prosecutor and Jerry. Thus, he argues, the prosecution's failure to disclose the conversations violated *Brady v. Maryland,* 373 U.S. at 87, and the undisclosed information met the standard for newly discovered evidence meriting a new trial under K.S.A. 22-3501.

The State argues the district judge correctly found the communications between the prosecutor and Hailey's parents were not exculpatory. In addition, the State argues that there was no bad-faith suppression of the information and it was not material enough to make it, even in hindsight, worthy of disclosure. Finally, the State also asserts the defense had knowledge of the PFA petition and thus had sufficient notice to investigate the circumstances of its filing and withdrawal.

The standard of review of an order denying a motion for a new trial based on newly discovered evidence is "whether the district court abused its discretion." *State v. Moncla*, 273 Kan. 856, 861, 46 P.3d 1162 (2002). A decision will not be reversed on appeal "if a reasonable person could agree with the district court's decision." *Moncla*, 273 Kan. at 861. In reviewing the lower court's decision, the party asserting the claim has the burden of proving the lower court abused its discretion. *State v. Flynn*, 274 Kan. 473, 496, 55 P.3d 324 (2002).

*Brady* holds that the prosecution may not suppress, either in good or bad faith, evidence favorable to the defendant and material to guilt or punishment without violating the defendant's due process rights. *Brady*, 373 U.S. at 87. There are three scenarios in which *Brady* applies. *United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). Our formulation of those scenarios is:

"(1) where there is a deliberate bad faith suppression for the purpose of obstructing the defense or intentional failure to disclose evidence which has high probative value and which could have not escaped the prosecutor's attention; (2) where there is a deliberate refusal to honor a request for evidence where the evidence is material to guilt or punishment, irrespective of the prosecutor's good or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that it was so material that the defense could have put the evidence to significant use." *State v. Kelly*, 216 Kan. 31, 34, 531 P.2d 60 (1975).

This formulation requires the State to disclose evidence that could be exculpatory to a defendant even when no request for the disclosure has been made. *Kelly*, 216 Kan. at 34. According to the formulation's sliding scale, the required degree of the evidence's materiality to the defendant's case increases as the classification of the level of intent supporting the State's conduct decreases. The first category requires a fairly low showing of materiality, and the third category requires that "the evidence withheld must have a high degree of materiality relating to a defendant's guilt or punishment if the conviction is to be found constitutionally infirm." *Kelly*, 216 Kan. at 34.

In this case, there is no evidence that the prosecution deliberately withheld the information of the meeting between the prosecutor and the parents of Hailey, and there was no request by the defense for such evidence. Thus any failure to disclose evidence here falls into the third category governing the least serious prosecutorial oversight. In order to grant a new trial based on such conduct, "the evidence must be clearly exculpatory, and the evidence must be material so that its suppression was clearly prejudicial to the defendant." *State v. Aikins,* 261 Kan. 346, 382, 932 P.2d 408 (1997).

To qualify as exculpatory, evidence must tend "to disprove a fact in issue which is material to guilt or punishment," *State v. Carmichael,* 240 Kan. 149, 153, 727 P.2d 918 (1986), or "[create] reasonable doubt and [affect] the outcome of the trial." *Aikins,* 261 Kan. at 383. Evidence going to the credibility of a witness can be considered exculpatory. *Kelly,* 216 Kan. at 37. "Clearly prejudicial" evidence must hamstring a defendant's ability to respond to the charges. *Aikins,* 261 Kan. at 384 (citing *State v. Humphrey,* 258 Kan. 351, 355-56, 905 P.2d 664 [1995]).

The undisclosed information about the prosecutor's pretrial conversations with Hailey's parents was not clearly exculpatory; neither was it so material that its nondisclosure was clearly prejudicial. Even if we assume the prosecutor encouraged the withdrawal of Jerry's PFA petition, which she testified she stopped short of doing, the fact of that encouragement would not have added anything of substance to the knowledge the defense already possessed. The defense was aware of the PFA filing. If it did not possess a copy of the petition, with its reference to Lori lying, it could have obtained one. Had the defense wanted to capitalize on the PFA petition to question Lori's credibility, it could have done so. The circumstances surrounding its withdrawal would have added little. The information also was not so vital that the defense was prevented from answering the charges against Adams. Even if Lori was threatening toward her husband or lying to him or others after Hailey's death, these behaviors did not make it more likely that she, rather than Adams, committed the murder. There was no *Brady* violation necessitating reversal.

To the extent Adams supplements his *Brady* argument with an argument that the information about the prosecutor's conversations constituted newly discovered evidence necessitating a new trial under K.S.A. 22-3501, he must demonstrate "that the evidence is in fact 'new' and could not have been produced at trial with reasonable diligence." *State v. Henry,* 263 Kan. 118, 132-33, 947 P.2d 1020 (1997). The undisclosed evidence must also be of "such materiality that a reasonable probability exists that it would result in a different outcome at trial." *Henry,* 263 Kan. at 132-33.

Adams cannot meet this standard. Again, defense counsel knew of Jerry's PFA petition and its withdrawal. Minimal investigation into the allegations and why they were withdrawn would have led the defense to the fact that the petition was withdrawn shortly after Jerry met with the prosecutor. Under these circumstances, Adams did not meet his burden to demonstrate the undisclosed information was "new." We have already discussed in the context of *Brady* that it was not so material that it would have given rise to another outcome.

The trial judge did not abuse his discretion when he denied Adams' motion for a new trial. Reasonable persons could agree with the judge that neither *Brady* nor K.S.A. 22-3501 required a new trial.

*Admission of Child Abuse Allegations and Divorce Decree*

Adams proffered notes from a family clinic containing allegations that Lori had physically, emotionally, and sexually abused one of her daughters from her previous marriage, and a divorce decree granting Lori only supervised visits with the children of that marriage. According to Adams, this evidence—along with admitted evidence that Hailey was fussy and lethargic on the day she died and evidence that Lori had been seen acting aggressively toward Hailey weeks before—was integral to his theory that Lori, rather than he, abused Hailey and caused her death.

Although the State recognizes the right of a criminal defendant to offer evidence in support of his or her theory of the case, it argues that the right to present evidence of a third party's guilt is not absolute. In the State's view, the direct evidence against Ad-

ams, including his confession and demonstration, meant the proffered evidence merely suggesting Lori could have had a role in Hailey's death was inadmissible. The State also argues that the medical testimony about when Hailey's fatal injuries occurred warranted the exclusion of the evidence proffered by the defense.

Our first consideration when examining appellate challenges to a district court's admission of or refusal to admit evidence is relevance. See *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004) (citing *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 [2004]). Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. *Carter*, 278 Kan. at 77. It is also true that an evidentiary decision based on an erroneous interpretation of the law can be equivalent to an abuse of discretion. See *Koon v. United States*, 515 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996) (abuse of discretion standard includes consideration of whether exercise of discretion rested on error of law).

A district judge's decision under the third-party evidence rule at the heart of the evidentiary question before us here is subject to an abuse of discretion standard of review on appeal. See *State v. Marsh*, 278 Kan. 520, 531, 102 P.3d 445 (2004) ("sound exercise of judicial discretion dependent on the totality of facts and circumstances in a given case"), *rev'd on other grounds* 548 U.S. ___, 165 L. Ed. 2d 429, 126 S. Ct. 2516 (2006). Discretion is abused when "judicial action is arbitrary, fanciful, or unreasonable." *State v. Shelby*, 277 Kan. 668, 677, 89 P.3d 558 (2004). If a reasonable person could have taken the view adopted by the district judge, then no abuse of discretion has occurred. This standard of review places the burden of proof on appeal on the party alleging that such an abuse of discretion occurred. *Meeks*, 277 Kan. at 618.

This court's most recent discussion of the third-party evidence rule appears in *State v. Marsh*, 278 Kan. at 531-34. Although as of this writing, *Marsh*'s holding striking down the state's death penalty statute will soon be argued before the United States Supreme Court, and thus our mandate has not yet issued, we discuss our

clarification of Kansas' third-party evidence rule in *Marsh* because that portion of the opinion will not be subject to further review.

In *Marsh*, defense counsel attempted to introduce evidence concerning the culpability of Eric Pusch, the husband and father of the two victims. Specifically the defense wanted to put on evidence of Pusch's motive and opportunity to commit the crimes, as well as his potential connection to a murder weapon. The district court refused to admit the evidence, interpreting the Kansas third-party evidence rule to forbid introduction of *circumstantial* evidence of a third party's guilt when the State had presented *direct* evidence of the defendant's guilt. *Marsh*, 278 Kan. at 526-27.

We made clear that admission of third-party evidence did not turn on the sometimes hazy distinction between direct and circumstantial evidence. Rather, we said, a district judge must evaluate the totality of facts and circumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged. *Marsh*, 278 Kan. at 531. In addition, we said, "[W]hile evidence of the motive of a third party to commit the crime, standing alone, is not relevant, such evidence may be relevant if there is other evidence connecting the third party to the crime." *Marsh*, 278 Kan. at 531. With the rule thus enunciated, we held that the exclusion of the defendant's proffered evidence was reversible error. Marsh had proffered more than mere evidence Pusch had a motive. For example, there was direct evidence that Pusch's blood as well as the blood of a victim appeared on Marsh's shoes. *Marsh*, 278 Kan. at 527.

Adams directs our attention to *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003), in which we wrote: "Circumstantial evidence that would be admissible and support a conviction if introduced by the State cannot be excluded by a court when offered by the defendant to prove his or her defense that another killed the victim." We also noted in *Evans* that, although this court recognizes "no distinction between direct and circumstantial evidence in terms of probative value," the exclusion of evidence establishing "nothing more than mere speculation and conjecture to connect the third party to the crime" is not error. *Evans*, 275 Kan. at 104-05.

In *Evans*, the defendant attempted to admit circumstantial evidence that another individual was seen holding the murder weapon immediately after the fatal shot was fired. There also was evidence that the other individual subsequently admitted to shooting the victim and dumping his body. *Evans*, 275 Kan. at 97, 101. We held that this evidence should have been admitted; it directly linked the other person to commission of the crime. *Evans*, 275 Kan. at 106. As such, its exclusion was "inconsistent with substantial justice." *Evans*, 275 Kan. at 106.

We reached a different result in *State v. Hooker*, 271 Kan. 52, 21 P.3d 964 (2001). In that case, the State presented evidence that the defendant broke into the residence of the victim and his girlfriend, asked about money, struggled with the victim, and shot him in the back. A burgundy Cadillac had been seen in the parking lot at the time of the shooting; three days later, the girlfriend of the victim saw a burgundy Cadillac at a gas station and recognized the defendant as the man who had broken in and shot her boyfriend. She wrote down the license plate number and called the police, who picked up the defendant later that day.

In response, the defendant sought to introduce evidence that two other persons had threatened the victim. He conceded that the proffered evidence was hearsay based on rumors. We held the evidence was irrelevant in the absence of other evidence to connect either of the two persons to the victim's death. *Hooker*, 271 Kan. at 65-66.

The situation here is closer to that in *Hooker* than to that in *Marsh* or *Evans*.

The State had a wealth of evidence against Adams, both direct and circumstantial. He confessed to the crime, demonstrating for law enforcement how he threw Hailey down and shook her. Expert medical testimony established that Hailey's injuries occurred approximately 10 to 14 hours before she was declared dead and that the injuries would have made her unconscious immediately. Adams was with her in the relevant time period, while Lori was not. When Hailey arrived at daycare, and for several hours thereafter, she was not gravely injured or unconscious.

Neither of the pieces of evidence Adams proffered could place Lori at the crime scene at the pertinent time and thus link her to Hailey's fatal injuries. The same was true of the other pieces of evidence that were admitted—Hailey's fussiness and lethargy on the day of the crime and Lori's aggressive behavior from weeks earlier. Defendant's theory of the case lacked a critical element— medical evidence that injuries inflicted at a time when Lori was with Hailey could have caused Hailey's death. Without competing evidence on the mechanism and timing of the fatal injuries, Adams' effort to pin blame on Lori amounted to baseless innuendo. In such a situation, the district judge's decision to exclude the family clinic record and the divorce decree did not qualify as an abuse of discretion.

### Demonstrative Exhibit on Shaken Baby Syndrome

Adams next challenges the State's use of a demonstrative PowerPoint exhibit to illustrate Shaken Baby Syndrome. Adams argues that the presentation purported to re-create the crime in a manner wholly unsupported by the evidence, a situation that, at a minimum, should have been explained through a cautionary jury instruction. Adams sought no such instruction at trial, although he did object to the State's use of the demonstrative exhibit.

Our standard of review on appellate challenges to the admission or exclusion of evidence is stated above. Our first question is relevance. Despite Adams' argument that the exhibit varied from the facts of this case, we have no hesitation in holding that the demonstrative exhibit illustrating Shaken Baby Syndrome was relevant. The syndrome was a prominent feature of the medical testimony, and the mechanism of and injuries inflicted by the syndrome are not matters about which the average lay juror has knowledge.

Our recent decision in *State v. Torres*, 280 Kan. 309, 121 P.3d 429 (2005), addressed a nearly identical issue. As in that case, we see no error in the district judge's decision here. The PowerPoint demonstrative aide fairly and accurately represented Shaken Baby Syndrome and assisted in explaining the medical testimony.

Regarding the absence of a cautionary instruction:

" 'No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous [K.S.A. 2002 Supp. 22-3414].' The failure to give an instruction ' " 'is clearly erroneous only if the reviewing court reaches a firm conviction that absent the alleged error there was a real possibility the jury would have returned a different verdict.' " ' [Citation omitted.]" *State v. Boone,* 277 Kan. 208, 220, 83 P.3d 195 (2005).

Applying the clearly erroneous standard here, we see no real possibility Adams' jury would have returned a different verdict had a cautionary instruction on the Shaken Baby Syndrome exhibit been given. The jury saw a videotape of Adams' demonstration of his extremely rough handling of Hailey. The violence depicted in that demonstration easily exceeded the violence of the demonstrative PowerPoint exhibit. A cautionary instruction regarding the PowerPoint exhibit would not have protected Adams from the jury's ultimate decision.

### Lesser Included Offense Instructions

Adams' next argument is that the district court erred by failing to instruct on lesser included offenses. He asserts that the jury could have concluded, based on the first statement he gave, that the trauma Hailey suffered in her fall caused her death.

The defense did not object to the omission of the lesser included offense instructions at trial. In fact, Adams' lawyer said he "presume[d]" an instruction on involuntary manslaughter would not be given, and it "was probably clearly implied" that it would be inappropriate to instruct on any lesser included offenses.

As mentioned above in relation to the cautionary instruction on the PowerPoint exhibit, the controlling standard of review when a criminal defendant has not objected to a certain jury instruction given or has failed to offer a certain jury instructions not given is the clearly erroneous standard. K.S.A. 2001 Supp. 22-3414(3). This holds true even in a felony-murder case, although we have also said that no lesser included offense instructions need be given unless the evidence of the underlying felony is weak, inconclusive, or confusing. See *State v. Calvin,* 279 Kan. 193, 201, 105 P.3d 710 (2005);

*State v. Branning,* 271 Kan. 877, 887, 26 P.3d 673 (2001). Regardless of the specific charged crime, the clearly erroneous standard remains the touchstone. See *Torres,* 280 Kan. at 326 (*Branning* analysis unnecessary in felony-murder case when lesser included offense instruction not requested); see also *State v. Engelhardt,* 280 Kan. 113, Syl. ¶ 7, 119 P.3d 1148 (2005) (in premeditated first-degree murder case, clearly erroneous standard cannot be met when evidence would not permit rational factfinder to find defendant guilty of lesser included offenses). In a felony-murder case, an appellate court may or may not need to determine whether the evidence supporting the underlying felony was weak, inconclusive, or confusing in order to determine whether the absence of lesser included instructions was clearly erroneous.

Regardless, Adams cannot surmount the clearly erroneous standard here. The intent level required for felony murder based on child abuse is only that the actor intend the act of hitting or hurting the child, with no requirement that injury be intended. *State v. Heath,* 264 Kan. 557, 572, 57 P.2d 449 (1998). This court has found that injuries of a certain nature and severity negate the possibility that they could have been inflicted other than by child abuse. *Heath,* 264 Kan. at 572.

In this case, the medical testimony and Adams' own statements and demonstration make it virtually impossible that any jury could have convicted him of a lesser offense, had an instruction on that offense been given. The coroner's testimony was that the injuries were not consistent with accidental injury, and Adams admitted to purposely throwing and shaking Hailey. There was additional testimony that Hailey was so severely injured that there could have been no conscious interval after her injuries were inflicted. One doctor testified that she was probably brain dead upon arrival at the hospital.

Under these circumstances, the district judge did not err when he did not give lesser included offense instructions.

### Admission of Autopsy Photographs

Adams next argues that the district court erred by admitting autopsy photographs..

The photographs at issue—Exhibits 29, 31, 32, 36, 38, and 39—were, as Adams suggests, bloody and disturbing. But they were certainly relevant, our first consideration. See *Torres,* 280 Kan. at 327. They also aided the jury in understanding Hailey's injuries, providing context for the testimony of the coroner.

" 'The admission of photographs in a homicide case is a matter within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent the showing of an abuse of that discretion.' [Citation omitted.]" *State v. Green,* 274 Kan. 145, 147, 48 P.3d 1276 (2002) (quoting *State v. Bell,* 273 Kan. 49, 52, 41 P.3d 783 [2001]). That discretion has been abused " 'when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice.' " *Green,* 274 Kan. at 147 (quoting *Bell,* 273 Kan. at 52).

Further,

" '[p]hotographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. [Citation omitted.] Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. [Citation omitted.] Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible. [Citation omitted.]' " *Green,* 274 Kan. at 147 (quoting *Bell,* 273 Kan. at 53).

We have also noted that "[g]ruesome crimes result in gruesome photographs." *Green,* 274 Kan. at 148.

In this case, the photographs were carefully selected to explain the coroner's testimony about Hailey's injuries and cause of death. This was a valid purpose. Any prejudice was not undue. The trial court did not abuse its discretion.

### Admission of Adams' Confession

Adams' sixth issue questions the admission of his confession under *Crawford v. Washington,* 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). Adams argues for the first time on appeal that he was faced with a Hobson's choice: Either allow the statements he made to police to go unchallenged, or surrender his constitutional right not to testify. Adams asserts he should not have to forego one constitutional right to preserve another.

Issues pertaining to the Confrontation Clause of the Sixth Amendment to the United States Constitution raise questions of law, and our standard of review is de novo. See *State v. Johnson-Howell*, 255 Kan. 928, 938, 881 P.2d 1288 (1994). However, as a general rule, issues that were not raised before the trial court are not eligible to be raised on appeal. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003). This court has recognized several exceptions to this general rule:

" '(1) the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; (2) questions are raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of a trial court may be upheld on appeal although that court may have relied on the wrong ground or assigned a wrong reason for its decision. [Citations omitted.]' " *State v. Wiegand*, 275 Kan. 841, 844-45, 69 P.3d 627 (2003) (quoting *State v. Mincey*, 265 Kan. 257, 267, 963 P.2d 403 [1998]).

Adams contends that this issue falls within either the first or the second category of exceptions. Because Adams' right not to be compelled to testify against himself and his right to confront witnesses are at stake, we address the merits of this issue under the second exception.

In *State v. Meeks*, 277 Kan. 609, 614, 88 P.3d 789 (2004), this court held that *Crawford v. Washington* stood for the proposition that "witnesses' out-of-court statements that are testimonial are barred under the Confrontation Clause unless (1) the witnesses are unavailable and (2) the defendants had [a] prior opportunity to cross-examine those witnesses."

We rejected this argument in *Torres*, 280 Kan. at 319-20. We see no reason to depart from that ruling here.

### Cumulative Error

Adam's final argument is that, even if none of the individual claims addressed above warrants reversal of his conviction, the cumulative effect of the errors he alleges demands reversal. Having held that there was no error; we also hold that the cumulative error rule is inapplicable to Adams.

Affirmed.

LOCKETT, J., Retired, assigned.