No. 101,508

Kenneth E. Haddock, *Appellant*, v. State of Kansas, *Appellee*.

(286 P.3d 837)

Opinion filed October 5, 2012.

*Elizabeth Seale Cateforis*, of Paul E. Wilson Project for Innocence & Post-Conviction Remedies, University of Kansas School of Law, of Lawrence, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This appeal follows a district court's denial of a defendant's motions for new trial based on postconviction DNA testing that was allowed under K.S.A. 21-2512. The postconviction DNA testing produced some results that were favorable to the defendant, some results that confirmed evidence at trial, and some results that were inconclusive because the small amount and the degradation of the DNA prevented DNA matching. Weighing the mixed results of this evidence, the district court concluded there was not a reasonable probability that the new evidence would have changed the outcome of the trial.

We have previously held that an abuse of discretion standard of review applies when the issue on appeal is whether a district court

erred in ruling on a motion for new trial based on favorable post-conviction DNA test results. Applying this standard to this case, we conclude reasonable people could agree with the district court that the postconviction DNA test evidence was not so material as to make it reasonably probable there would be a different outcome if there were a new trial. Hence, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This is the third appeal considered by this court in this case. In the first appeal, this court affirmed Kenneth E. Haddock's conviction and sentence for the premeditated first-degree murder of his wife, Barbara Haddock. *State v. Haddock*, 257 Kan. 964, 897 P.2d 152 (1995) (*Haddock I*), *overruled on other grounds by State v. James*, 276 Kan. 737, 750-51, 79 P.3d 169 (2003) (altering appellate standard of review on suppression issue of whether defendant was in custody when interrogated by law enforcement officers). After that appeal, Haddock filed several motions, including two motions for new trial based on postconviction DNA testing. The district court denied Haddock's motions, and Haddock pursued a second appeal that culminated in this court's decision in *State v. Haddock*, 282 Kan. 475, 146 P.3d 187 (2006) (*Haddock II*).

In *Haddock II*, this court remanded the case to the district court after determining the district court erred in its treatment of Haddock's two motions requesting a new trial based on postconviction DNA test results. *Haddock II*, 282 Kan. at 525. On remand, further DNA testing occurred, and the district court heard evidence regarding the postconviction DNA test results. The district court then made the ruling that is the subject of this appeal, again denying Haddock's motions for new trial.

Resolving this appeal requires us to compare the evidence presented to the jury with the evidence revealed by the postconviction DNA test results. Consequently, a detailed discussion of the facts is necessary. Additional facts are included in the decisions in *Haddock I* and *Haddock II*.

*Evidence at Trial*

In November 1992, Barbara was found dead in her garage, buried under a pile of firewood. Police responding to a 911 call quickly suspected foul play because there was a pool of blood some distance from the wood pile and because Barbara's injuries were inconsistent with crushing injuries from falling wood. An autopsy revealed bruises and abrasions on Barbara's hands and arms that were consistent with defensive wounds, bruises and lacerations on her face, and other trauma to her head consistent with 6 to 12 blows with a blunt object.

Investigators concluded that the crime scene had been orchestrated. Blood spatters and smears suggested that Barbara had been moved from one location in the garage to the wood pile. Additionally, her blood was found on her car, which police found in the driveway. The location and nature of the blood spatter on the car, when considered together with other blood spatter evidence inside the garage, suggested that Barbara had been beaten while the car was in the garage. This led to the conclusion the car had been moved after the murder. Detectives suspected the murder weapon was a fireplace poker that had been wiped clean and was much cleaner that the other fireplace tools they found in the Haddocks' home.

On the evening of the murder, detectives questioned Haddock, at which time they observed and photographed two scratches on Haddock's right wrist that appeared fresh. Detectives also seized the shoes Haddock was wearing, in which they found wood chips. Haddock would eventually explain the chips were there because he had built a fire for Barbara in the early afternoon while he was at home for lunch. Detectives were suspicious of Haddock's response to the news of his wife's death, in large part because of his insistence that her death resulted from the falling wood. Haddock maintained his innocence, but he was arrested 5 days after Barbara's death.

The State built its case on circumstantial evidence, largely related to the orchestrated crime scene. Evidence was presented that the wood pile had fallen a few weeks before the murder and that

Haddock and his family members were the only ones who likely knew of that incident. There was also evidence of marital discord and stress. Haddock had been found guilty in federal court of bank fraud and other offenses and had been sentenced to prison. After an appeal and remand, Haddock was facing resentencing but remained on bond at the time of the murder. Testimony from a friend of Barbara's established that Barbara would become very upset and emotional when discussing the future, she was "becoming very frustrated" with the expense of defending the bank fraud case, she was concerned they were going to have to use their son's college fund, and "she was getting angry with Ken that it kept going on and on and on."

In addition, DNA evidence was presented that linked blood found on Haddock's clothing and shoes to Barbara. The clothing— a shirt and pants—were found by police on the floor of Haddock's home near the garage, and the shoes were those seized by detectives at their interview of Haddock. Haddock explained that he had placed the shirt and pants near the laundry room before he left the house because Barbara was going to mend the items.

Both pieces of clothing and the shoes had small amounts of blood on them. Significantly, no other blood evidence was found in the house. Haddock maintained the blood was transferred to the clothing when his daughters, who had discovered their mother in the garage, and his neighbors, who the daughters had summoned to provide Barbara first aid, walked by the clothes. He thought the blood had been transferred to his shoes when he hugged his daughters. The State disputed this theory with evidence that there were no other blood drippings or smears in the house, with a description of Barbara's blood as being coagulated by the time first aid was attempted, and with blood spatter evidence that led experts to opine that the blood pattern on the clothing and shoes was consistent with what could be expected if the clothing had been worn at the time of the beating, not if the clothing had been contaminated by dripping or smeared blood.

An expert testified that blood spatters on the left shoe were on the inside portion of the shoe, consistent with where most of the blood was found on Haddock's pants. Likewise, blood was found

on the outside area of the right shoe, again consistent with where a lot of the blood on the right pant leg was found. The expert drew the conclusion from this evidence that the shoes and pants were worn at the same time when the spatter pattern was deposited. A second expert concurred in these opinions.

Other DNA evidence presented at trial linked Haddock to hair found clutched in Barbara's right hand. Detectives found two hairs, one of which showed DNA markings consistent with Haddock. The other produced no DNA markings.

Haddock presented an alibi defense that implied an unknown party committed the murder. Haddock attempted to give credence to the possibility of a random murder—a so-called phantom murderer—through evidence that the day of the murder was a gang initiation day. The district court denied the admission of the gang evidence.

Haddock admitted to having been home with Barbara around lunch time and in the early afternoon. As to the alibi, Haddock pointed to Barbara's watch, which had been damaged in the beating and had stopped at 3:16 p.m., and a receipt imprinted with a 3:18 p.m. time stamp from a Wendy's restaurant located more than 10 minutes away from the Haddock home. Haddock testified he left home at approximately 2 p.m., went to the Olathe Public Library to do research for his federal case, and then to Wendy's, where he bought food. He then drove to look at some property for a possible investment purchase by his company and finally back to the office, where he was immediately told by his secretary to go home.

The State rebutted the alibi with evidence that the hands of the watch could have been manipulated even though the watch was broken. In addition, the State cast doubt on the watch accurately reflecting the time of death by pointing to evidence the Haddocks' daughter returned home within minutes of the time the watch allegedly stopped but saw nothing alarming, to evidence a neighbor heard a noise around 2 p.m. that she later compared to the sound she heard when the police moved the wood, and to evidence that Barbara had not answered the phone when called at about 3 p.m. Finally, the State presented the testimony of two front desk clerks

at the Olathe Public Library who worked the afternoon of Barbara's murder. They testified it was a slow afternoon and they did not remember seeing Haddock or anyone resembling Haddock in the library. The State also refuted the implication of a random murder by establishing that nothing was missing from the house or garage and the murderer had orchestrated the crime scene, including moving, but not stealing, the car.

The State argued the 6 to 12 blows to the back of Barbara's head, some of them delivered after she was lying on the floor, according to blood spatter patterns, provided evidence of premeditation. The State asked the jury to infer that Haddock went from "acting on impulse" to realizing that he had gone too far to turn back and thus knew "exactly what he was doing" in administering the multiple, lethal blows. The State argued that Haddock then moved the car and Barbara, moved the hands on the watch, and pushed the wood on top of Barbara in an attempt to make the death appear accidental, hoping there would not be a rigorous investigation.

The jury convicted Haddock of premeditated first-degree murder, and this court affirmed that conviction. *Haddock I*, 257 Kan. at 988.

Soon after the first appeal was resolved, Haddock began filing a litany of postconviction motions. See *Haddock II*, 282 Kan. at 483-91 (detailing the postconviction litigation). Two of these motions are at issue in this appeal; both are motions for new trial based on postconviction DNA testing under K.S.A. 21-2512.

*Proceedings Leading to* Haddock II: *The First Motion for DNA Testing*

Haddock filed his first motion referencing K.S.A. 21-2512 just a few weeks after that statute became effective on July 1, 2001. In the motion, Haddock requested DNA testing of three pieces of evidence: two hairs found in Barbara's hand, a pair of eyeglasses found in the garage, and some fingernail scrapings taken from Barbara's hands. These items received varying levels of attention at trial.

Of the three items, the hair was most frequently mentioned; Haddock asserts the word "hair" occurs 111 times in the trial transcript.

The hair was first mentioned in the State's opening statement when the State described where the two hairs were found, explained that DNA testing had been performed on the hair, and argued:

"They appeared to be body hairs, hairs that you would get off arm or leg or those sort of things and there was enough root on one of those hairs to compare it to the DNA type that the defendant has, and the expert testimony will be that the DNA type from that hair, from that body hair, matches up with the DNA type of the defendant that's on trial in this case."

Then, during the State's case, a forensic examiner provided evidence about the location of the two hairs found in Barbara's right hand. One hair was found in the palm of her hand, and the second hair was closed tightly between the right middle finger and the right ring finger. A photograph of Barbara's hand depicting one of the hairs was admitted at trial.

Next, some evidence was presented regarding DNA testing of the hair through the testimony of Robert C. Giles, Ph.D., scientific and laboratory director for GeneScreen laboratory in Dallas, Texas. The hair was tested by DQ Alpha testing. The jury was generally told there was more than one method of testing DNA and that DQ Alpha testing is a relatively inexact form that can sometimes eliminate DNA contributors but generally cannot narrow the perpetrator down as precisely as other testing methods. See *District Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 57, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009) (explaining DQ Alpha testing). In *Haddock II*, this court discussed the GeneScreen results regarding the hair by stating:

"The 1993 GeneScreen report identified the existence of three DQ Alpha types (also referred to as alleles or genotypes) in the hair of the right hand of the victim (faint 1.1, 1.2, 4). However, the report also provided in relevant part:

" 'In addition, specimen FOR1519-3639 (hair) typed as a 1.1/4. *Due to the presence of the 1.1/4 DQ alpha type and the nature of the testing procedure, it is not possible to determine if a 1.2 type may also be present.* The 1.1/4 type matches specimen FOR1519-3351 (blood-K. Haddock) which also typed as 1.1/4.

" 'The frequency of the DQ 1.1/4 alpha type in three North American populations is as follows:

| | |
|---|---|
| 'Blacks | 9.1% |
| 'Caucasians | 7.4% |
| 'Hispanics | 5.9%.' " *Haddock II*, 282 Kan. at 484. |

Giles testified that Haddock's DQ Alpha profile was 1.1/4; Barbara's was 1.2. Giles testified that the typing they achieved on the hair was 1.1/4, which was "consistent with the blood of Mr. Haddock and is inconsistent with the blood of Mrs. Haddock." On cross-examination, defense counsel focused on the opinion in the report indicating it was not possible to determine if a 1.2 DQ Alpha type, such as Barbara's, was also present in the hair sample. Defense counsel also asked Giles about the percentages of the various population groups that could not be excluded as the hair donor.

The hair was again mentioned during the State's cross-examination of Haddock, when the following exchange regarding the hair occurred:

"Q. [State]: Would you agree that whoever this murderer was, was in all likelihood somebody with hair that matches your DNA?
"A. [Haddock]: I have no knowledge of that.
"Q. [State]: You do know, though, that a hair matching your DNA was found clinched between two fingers of Barbara's right hand; isn't that correct?
"A. [Haddock]: It also was not.
"[Defense Counsel]: Object as argumentative. That misstates the evidence in the case on cross-examination.
"[The Court]: Court will sustain the objection."

Finally, the hair was briefly mentioned during defense counsel's closing argument when counsel stated:

"DNA hair is interesting. The DNA hair, we know the procedure that was used, the one in twenty method, not the more reliable procedure, but we know that of the procedure that was used, the exact quote from Doctor Giles was, 'It's not possible to determine if a one point two type may be present,' and we know Barb had DQ Alpha, one point one and one point two. . . . Is that so uncommon to have body hair in your own hand, and yet they say beyond a reasonable doubt they've shown that it's Ken's body hair, and there's no explanation that it's Ken's or Barb's. State hasn't shown beyond a reasonable doubt that it's Ken's hair."

The other two items of evidence—the scrapings of material beneath Barbara's fingernails and the eyeglasses—were not directly

mentioned during the presentation of evidence at trial. The evidence admitted at trial of the two scratches on Haddock's arm make the fingernail scrapings relevant. The detective who interviewed Haddock on the night of the incident testified he observed red, fresh scratches. The detective further testified there were still flaps of skin at the edge of the scratches. The scratches were connected to the lack of DNA evidence from Barbara's fingernails by defense counsel during closing argument when he asked the jury, "Where's the evidence of the fingernail scrapings with respect to that, if it's consistent with their theory?"

The eyeglasses were not significantly mentioned during the case's proceedings until a postconviction hearing. At that time, Haddock's son, Steve, testified he saw a pair of eyeglasses listed in some police documents that itemized objects found in the garage. Steve maintained these were not Barbara's glasses because her glasses were accounted for in the house and Barbara would only wear her glasses on occasion when she was reading or while driving at night. Steve admitted that his mother may have had other pairs of glasses, but he maintained that she only wore one pair on a consistent basis.

The parties jointly agreed to allow DNA testing of the hair, eyeglasses, and fingernail scrapings and agreed that the testing would be done by Dr. Brian Wraxall, Chief Forensic Serologist of the Serological Research Institute of Richmond, California.

*The Next Proceeding Leading to* Haddock II: *Haddock's Motion to Dismiss*

On April 10, 2002, Haddock filed a "Motion to Dismiss," arguing the DNA testing conducted by Wraxall showed that the hair in Barbara's hand came from a female and was inconsistent with Barbara's DNA. Haddock also argued that a reanalysis of the DNA testing admitted at trial revealed that the blood found on Haddock's shoes was consistent with Haddock's blood rather than that of Barbara.

The district court held an evidentiary hearing on Haddock's motion on August 7, 2002. The *Haddock II* court described Wraxall's testimony at this hearing, stating:

"Dr. Wraxall testified that the hair had been subjected to STR analysis, which was much more discriminatory than the HLADQ alpha system initially reported by GeneScreen; STR analysis determined that the hair was from a female that was not consistent with the victim. The hair also had a fair amount of cellular debris which was consistent with the hair being pulled out of the head. Dr. Wraxall concluded that the DNA of the fingernail scrapings was that of the victim and there was no indication of any other source of the DNA. The DNA on the eyeglasses was also consistent with that of the victim; however, there was extraneous DNA on the glasses, possibly from a male source, but not consistent with Haddock." *Haddock II*, 282 Kan. at 487.

The district court did not allow Haddock to elicit testimony regarding Wraxall's analysis of the blood on the shoes because the parties had not agreed to retest the shoes. At the conclusion of the hearing, the district court found overwhelming evidence of Haddock's guilt and concluded Haddock had not "met his burden of showing there is a substantial question of innocence in this case." The court denied Haddock's motion.

*The Final Motion Leading to* Haddock II: *The Second Motion for DNA Testing*

On August 19, 2002, Haddock filed a "Motion for DNA Testing of Shoes, Pants, and Shirt." The district court granted Haddock's request for additional testing, and on March 21, 2003, Laboratory Corporation of America (Lab Corp.) filed its report. The Lab Corp. report found that presumptive chemical testing of the cuff area of the shirt failed to reveal the presence of blood, an attempt to develop a DNA profile from the cuff area of the shirt and the extracted DNA from the shoes failed to yield results due to insufficient quantities of DNA, and the DNA profile obtained from the DNA extract from the pants was consistent with a female source.

The State then suggested that Lab Corp. perform an additional process where the remaining extract from the shoes could be concentrated, which would enhance the chances of obtaining a DNA profile. This process was likely to require the complete consumption of the remaining shoe extract. Haddock did not agree to further testing.

*District Court's Ruling Leading to Appeal in* Haddock II

On October 24, 2004, the district court issued an order denying Haddock's second motion for DNA testing. The court found that Haddock's refusal to agree to further testing by Lab Corp. resulted in there being no substantive issues regarding the most recent DNA testing before the court. The court further found that all other motions had previously been ruled upon.

Haddock timely appealed. The case was transferred from the Court of Appeals to this court via this court's own motion pursuant to K.S.A. 20-3018(c).

On November 9, 2006, this court reversed the district court's orders regarding both of Haddock's motions for new trial based on DNA testing under K.S.A. 21-2512 and remanded the case to the district court for further proceedings. *State v. Haddock*, 282 Kan. 475, 525, 146 P.3d 187 (2006) (*Haddock II*). Regarding the postconviction testing of the hair, fingernail scrapings, and eyeglasses, the *Haddock II* court held DNA evidence did not have to be conclusively exonerating in order to be considered "favorable" to a defendant. See K.S.A. 21-2512(f). Instead, the *Haddock II* court concluded the results of the hair, fingernail, and eyeglasses testing were "favorable in part" because they established a "favorable inference that someone other than Haddock could have committed the murder." *Haddock II*, 282 Kan. at 501-02.

The *Haddock II* court further concluded the district court never made a finding regarding whether the evidence at issue in Haddock's second motion for DNA testing—the shoes, shirt, and pants—was favorable or unfavorable. Rather, the district court found that as a result of Haddock's refusal to submit the clothes for consumption testing, no substantive issues regarding this evidence were before it. The *Haddock II* court concluded the district court's resolution of the second motion was also erroneous. The *Haddock II* court held:

"On remand with reference to the defendant's second motion for DNA testing, the district court must enter a final order concerning the effect of the Lab Corp. results on the shoes, shirt, and slacks. As the record now stands, the evidence regarding the slacks is unfavorable to Haddock because the evidence at trial established the blood on the slacks belonged to the victim. At the same time, when

evidence of additional testing on the shoes and shirt are added to the mix, the court will have to make a determination as to whether the mix is favorable, unfavorable, or inconclusive.

"In many respects, the end result may depend upon Haddock. If Haddock chooses to proceed with further DNA testing on the shoes and shirt, then the courts would be in a position to evaluate whether the results of such tests are favorable, unfavorable, or inconclusive. If the results are favorable, then the district court must consider the results at the hearing with the favorable results under the first motion and enter any order consistent with the interests of justice as set forth in K.S.A. 2005 Supp. 21-2512(f)(2) and (3). However, if Haddock chooses not to go forward with further DNA testing on the shoes and shirt, the court must determine on the basis of the evidence before it whether such results are favorable, unfavorable, or inconclusive and apply the appropriate provisions of K.S.A. 2005 Supp. 21-2512(f)(2) or (3)." *Haddock II*, 282 Kan. at 503.

### Proceedings on Remand

On May 30, 2007, the district court held a hearing pursuant to K.S.A. 21-2512 where the parties agreed that consumption DNA testing could be performed by the KBI on the shoes and shirt. Eventually, the parties agreed the additional DNA testing should be performed by Wraxall.

On July 14, 2008, the district court held a hearing at which the court considered an April 30, 2008, report from Wraxall. Wraxall testified at the hearing regarding the testing he conducted on an extract from the shoes and four different cuttings from the shirt.

Wraxall was able to use a new process he had been using for 2 to 3 years that allowed him to remove the inhibitor from the shoe sample. The shoe sample itself could not be tied to a specific point on a shoe, and it was not known if several samples had been combined into the single, remaining sample. The new process, called STR testing, allowed Wraxall to obtain DNA results from the shoe sample where Lab Corp.'s testing had not been able to yield any results. Test results showed there was a mixture of DNA in the sample and some form of degradation. In Wraxall's opinion, the primary donor of the DNA was Barbara. Wraxall could not completely identify who the minor donor of the DNA was, but he testified it was consistent with Haddock. Wraxall also testified that he did not find any "alleles at any of the loci" that would suggest any type of third-party contribution.

Wraxall also explained why his opinion was contrary to his prior report that had led to Haddock's second motion. In preparing that report, Wraxall had examined the GeneScreen typing strips and then opined the DNA was inconsistent with Barbara's. Wraxall indicated that if it was assumed there was only one donor of the DNA in the shoe sample and the typing strip from GeneScreen did not indicate a secondary donor, the profile from the blood, an HLA DQ Alpha " '1.1, 4,' " was Haddock's profile. Wraxall testified at the July 2008 hearing that GeneScreen "simply missed identifying one of the dots. Particularly the 4 dot." Based on the correct identification of this typing strip, Wraxall testified that the typing strip indicated Haddock's DQ Alpha type and not Barbara's type.

Subsequent testing, however, led Wraxall to conclude that GeneScreen's results were "right for the wrong reason." Gene-Screen's ultimate conclusion was correct in that Barbara was the primary donor of the DNA contained in the shoe sample. Wraxall concluded that based on his April 2008 testing of the DNA in the shoe sample, there was a 1 in 65 billion chance that the major donor was someone other than Barbara. Wraxall testified, "[I]f the profile that you determine is greater than ten times the population of the earth, my view is that, that's that person." Thus, it was Wraxall's opinion that no one other than Barbara was the major donor of the shoe sample. Nevertheless, Wraxall testified on cross-examination that he did not conclusively know the kind of body fluid—blood, saliva, or some other form—contained in the DNA from the shoe sample because only a presumptive blood test had been performed.

Wraxall also testified regarding testing he conducted on cuttings from the shirt. Wraxall testified he was unable to draw any conclusions regarding some spots, some of which were as small as a pinhead and contained only trace amounts of DNA. Other cuttings gave an incomplete profile and appeared to be a DNA mixture; Wraxall stated that Barbara could not be excluded as the major donor of the DNA and that there were trace amounts of DNA from someone other than Barbara or Haddock. These tests basically confirm, or at least do not contradict, evidence at trial.

Wraxall's testing produced new evidence, however, from a cutting that was taken from the side of the left sleeve, above the cuff

(SERI item 19). There were three circled areas labeled 4, 5, and 6; these areas were described as "faint," and Wraxall noted that area "4 you could see, but 5 and 6 weren't real clear." Probably because of that, area 4 had already been cut from the shirt but areas "5 and 6 were not touched. And there is just very, very faint staining there." The cuttings from areas 3 to 6 revealed incomplete DNA profiles and mixtures. Wraxall testified Barbara could not be excluded as the major donor and Haddock could not be excluded as a minor donor. Even though the DNA was consistent with Barbara's DNA, as we will discuss in more detail, Haddock would argue the test was favorable because of the location of these samples, which was above the cuff.

As indicated, Wraxall testified there were trace amounts of DNA present in some cuttings from the shirt that came from neither Barbara nor Haddock. Wraxall's report concluded: "Trace amounts of DNA on soiled clothing can originate from the wearer, be present on the clothing before it is examined or be transferred from any person handling the clothing prior to examination."

On cross-examination, Wraxall testified that he conducted an orthotolidine presumptive test for blood on the shirt and that all six stains tested positive for the presumptive presence of blood. Based on the results of the presumptive test and the finding of human DNA, Wraxall concluded there was blood on the shirt. Wraxall admitted that presumptive testing can yield false positives. Wraxall also stated that at trial there was testimony about a phenolthalein test, a presumptive blood test that is weaker than the orthotolidine test, on certain items; Wraxall stated that if, based on the phenolthalein testing, testimony was provided at trial that the test revealed that the substance "was blood," that testimony would be incorrect as it was only a presumptive test. Wraxall testified, "[I]t doesn't say it wasn't blood. But you can't say, conclusively, that it was blood, based on that presumptive test." Nevertheless, when explaining the testing process, he indicated:

"[A.] . . . If I am finding human DNA, and I get a presumptive test, I put these two things together. But it is, on its own, it is not without any confirmation, it is just a presumptive test.

"Q. So what you have is, you did a presumptive test to determine it was blood, and then, based on your presumptive test, for blood, called phenolthaline [sic], finding of human DNA, you confirm—or that's how you made—

"A. That there is blood there, yes."

Alan Mattox, a forensic scientist with the Biology Section of the KBI, also testified at the hearing. He stated that he tested areas 1 to 4 of the shirt and all tested presumptive positive for blood. Mattox did not test areas 5 and 6 because they were very consistent in size and color with area 4, which tested presumptively positive for blood.

On October 8, 2008, the district court held one last hearing on Haddock's motions where, after hearing oral arguments from both sides, the court noted that the case was back before the district court on remand from the Kansas Supreme Court with a request for the court "to enter additional findings." The district judge ruled:

"This case, and I agree with [defense counsel], is a circumstantial case, certainly is. One of the major circumstances of the case was how the crime scene was orchestrated. It was clearly orchestrated to try to fool the police in some manner.

"At the first trial, we heard evidence concerning the hair and the eyeglasses and the fingernails. This occurred in a garage. Of course, not the cleanest place you could expect, but it occurred in a garage where the possibility of contamination existed. *Analysis of those items did not exonerate . . . Mr. Haddock, and [defense counsel] agreed that exoneration be proved [sic] here.* And I think the Supreme Court . . . considers it to be favorable facts from those items.

"The major overwhelming piece of evidence in this case was the woodpile. A very short list of people who knew anything about a fallen woodpile and that a third-party attacker could come up, use that as an excuse to come in, murder this woman brutally, and cover everything up, that is a powerful circumstance.

"We then had the results presented [of further testing of the shoes and shirt], and *those results were not favorable to Mr. Haddock.* And the Court now has some understanding of why it was so difficult to get those results from his expert. They were not favorable. They clearly were inculpatory.

"*I have to look and see whether this new evidence, this new DNA evidence would in any way impeach the verdict; is it material enough in that there would be a different outcome possible. I say no. This evidence I think reinforces the jury's verdict; not the other way around.*

"It is my belief, Mr. Haddock, that you killed your wife. If I had the slightest doubt to the contrary, I would grant you a new trial, but this evidence here is very persuasive, very overwhelming, and *there is no reasonable probability I think that*

*the outcome of the trial would be any different if another jury were selected to hear this case again.* There are just too many facts here that can't be overlooked.

"But as far as I am concerned, *the new DNA testing is unfavorable to you* in many respects.

"I think the findings of the Court are amply set forth in the State's supplemental brief. I don't think those were disputed. The effect of those I think is that the Court's conclusions are those set forth in the State's brief." (Emphasis added.)

The court entered a short written order that stated, in part, that the "court concurs with the statement of facts and conclusions of law as set forth in both of the State's motions. The court rules from the bench, and denies Petitioner relief."

Haddock timely appeals from this ruling. This court has jurisdiction under K.S.A. 20-3018(c).

## ANALYSIS

Haddock contends he is entitled to a new trial based on favorable results of DNA testing performed under K.S.A. 21-2512. To analyze these arguments, we must first examine K.S.A. 21-2512. We will then discuss Haddock's arguments that (1) the district court failed to follow the mandate of this court's remand order in *Haddock II* and (2) the district court erred in refusing to grant a new trial in light of the postconviction DNA testing.

### K.S.A. 21-2512(f)

Haddock's motions and this appeal are governed by K.S.A. 21-2512(f). Consequently, resolution of the issues on appeal requires us to interpret this statute. Questions of statutory interpretation are subject to unlimited review. *Goldsmith v. State*, 292 Kan. 398, 400, 255 P.3d 14 (2011). We reiterated the well-established rules of statutory interpretation in *Goldsmith*, another case interpreting K.S.A. 21-2512, where we stated:

"The 'fundamental rule governing the interpretation of statutes "is that the intent of the legislature governs if that intent can be ascertained." ' [Citations omitted.] 'The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted.' [Citation omitted.] When the statute's language is plain and unambiguous, the court is bound to apply the legislature's intent, and there is no need for this court to resort to any other rules of statutory construction. [Citations omitted.] Only when the statute is ambiguous on its face, may the court look at the historical background of [the] statute's

enactment, the circumstances surrounding its passage, the statute's purposes, and its effect. [Citation omitted.]" *Goldsmith*, 292 Kan. at 400.

K.S.A. 21-2512(f) addresses the procedures to be followed in three possible scenarios where the results of postconviction DNA testing (1) are unfavorable to the petitioner; (2) are favorable to the petitioner; and (3) are inconclusive. The statute requires "specific and distinct procedures for each result." *Goldsmith*, 292 Kan. at 402. The statute states:

"(f)(1) If the results of DNA testing conducted under this section are *unfavorable* to the petitioner, the court:
(A) Shall dismiss the petition; and
(B) in the case of a petitioner who is not indigent, may assess the petitioner for the cost of such testing.
"(2) If the results of DNA testing conducted under this section are *favorable* to the petitioner, the court shall:
(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and
(B) enter any order that serves the interests of justice, including, but not limited to, an order:
(i) Vacating and setting aside the judgment;
(ii) discharging the petitioner if the petitioner is in custody;
(iii) resentencing the petitioner; or
(iv) granting a new trial.
"(3) If the results of DNA testing conducted under this section are *inconclusive*, the court may order a hearing to determine whether there is a substantial question of innocence. If the petitioner proves by a preponderance of the evidence that there is a substantial question of innocence, the court shall proceed as provided in subsection (f)(2)." (Emphasis added.) K.S.A. 21-2512(f).

Haddock argues the district court's rulings on his motions are controlled by K.S.A. 21-2512(f)(2) because the results of the DNA testing are favorable. This means, he argues, the district court was required to hold a hearing and to grant him some form of affirmative relief. We reject this argument because a district court, while required to hold a hearing, is not required to grant affirmative relief if DNA testing is favorable to a petitioner. We reach this conclusion by examining the unambiguous language of K.S.A. 21-2512(f)(2).

Under the plain language of K.S.A. 21-2512(f)(2), if results are favorable, a district court is required to do two things. First, a

district court must hold a hearing. See *Goldsmith*, 292 Kan. at 402 ("If the DNA testing result is favorable to the petitioner, the district court *must* order a hearing and enter an order that serves the interests of justice."); *State v. Denney*, 283 Kan. 781, 789, 156 P.3d 1275 (2007) (plain language of statute requires hearing); *Haddock II*, 282 Kan. at 496 (provisions of K.S.A. 21-2512[f] contemplate full due process hearings). Second, a district court *must* enter an order after the hearing. But, in enacting K.S.A. 21-2512(f)(2), the Kansas Legislature did not require that this order grant the petitioner affirmative relief; even though the legislature listed only examples of affirmative relief, such as vacating the judgment or granting a new trial, the legislature indicated the list is not exclusive. This means, as we recognized in *Haddock II*, the "legislature has truly granted the district court wide discretion in the orders it may enter in its decision to serve the interests of justice. . . . [T]he grant is almost limitless consistent with the interests of justice and dependent upon the peculiar facts of the case being heard." *Haddock II*, 282 Kan. at 497. In some situations, justice may be served by denying a motion for a new trial. As the United States Supreme Court has recognized:

"DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. See *House v. Bell*, 547 U.S. 518, 540-548[, 126 S. Ct. 2064, 165 L. Ed. 2d 1] (2006). The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009).

See *Haddock II*, 282 Kan. at 501 (" 'Negative or non-match results are those . . . where the results show that the victim was not the source of a certain sample . . . , but which . . . do not necessarily exclude the defendant as the perpetrator.' ").

Implicitly recognizing that each K.S.A. 21-2512 petitioner is not entitled to a new trial, the *Haddock II* court imposed on petitioners seeking a new trial the burden of establishing that (1) postconviction DNA test results are favorable and (2) the new DNA " 'evidence . . . [is] of such materiality that a reasonable probability exists

that it would result in a different outcome at trial. [Citation omitted.]' " *Haddock II*, 282 Kan. at 502 (quoting *State v. Henry*, 263 Kan. 118, 132-33, 947 P.2d 1020 [1997]). In imposing this second requirement, the *Haddock II* court stated:

"The standard for whether to grant a new trial under such circumstances is similar to our standard for granting a new trial based upon newly discovered evidence, except that no time limit exists for such a motion and a defendant need not establish that the new evidence was newly discovered. In all other respects it is treated as a motion for new trial governed by the provisions of K.S.A. 22-3501: 'The court on motion of a defendant may grant a new trial to him if required in the interest of justice.' " *Haddock II*, 282 Kan. at 499.

Citing this language, the State argues Haddock did not meet his burden of establishing a right to affirmative relief. The State first suggests the results of the testing on the items subject to Haddock's second motion were unfavorable. Second, the State argues the district court correctly determined justice did not require further proceedings because of the minimal materiality of the favorable evidence related to the first motion when considered in the context of the entire case against Haddock.

The State does not suggest the DNA results were "inconclusive." In fact, the only suggestion by either party in their briefs that any test results were "inconclusive" is limited to testing in which a sample was insufficient or so degraded that a testing result could not be obtained. For example, in addressing the testing of a stain on Haddock's shirt, the State indicates: "Only trace levels of DNA were found. Dr. Wraxall's findings were therefore inconclusive." In this sense, the State is referring to whether the test resulted in a scientifically reportable DNA result, as opposed to whether the result was either inculpatory or exculpatory. See, *e.g.*, *Commonwealth v. Mattei*, 455 Mass. 840, 849 n.22, 853-54, 920 N.E.2d 845 (2010) (recognizing that in prior decisions the court had used the term "inconclusive" to mean that DNA evidence did not exclude an individual but clarifying that in the future the term "inconclusive" would be used only when a DNA sample does not contain enough DNA to draw a conclusion, DNA is degraded, or for other reasons a DNA test yields no results or the examiner draws no conclusion). We note a potential ambiguity as to which meaning of

"inconclusive" the legislature intended when it drafted K.S.A. 21-2512(f)(3). We did not discuss the legislature's intent in using the term "inconclusive" in *Haddock II*, instead simply accepting and adopting the context used by the district court, which was that the test results did not exclude Haddock. *Haddock II*, 282 Kan. at 500-01.

Nevertheless, in either context in which the word "inconclusive" could be used, there were inconclusive postconviction DNA test results in this case. Consequently, if the different results are segmented, we are presented with a situation where some of the postconviction DNA evidence is favorable, some is unfavorable, and some is inconclusive. See *State v. Haddock*, 282 Kan. 475, 501, 503, 146 P.3d 187 (2006) (*Haddock II*) ("results of the hair, fingernail, and eyeglasses testing, while not conclusively establishing Haddock's innocence, were favorable in part in that they supplied a favorable inference that someone other than Haddock could have committed the murder"; "the evidence regarding the slacks is unfavorable to Haddock because the evidence at trial established the blood on the slacks belonged to the victim"). This means that segments of the evidence could fit into each subparagraph of K.S.A. 21-2512(f). Or it could mean that the mix is inconclusive, with that word being used to mean that it does not completely exonerate or inculpate Haddock. *Haddock II*, 282 Kan. at 503 ("[W]hen evidence of additional testing on the shoes and shirt are added to the mix [with the unfavorable evidence regarding the pants], the court will have to make a determination as to whether the mix is favorable, unfavorable, or inconclusive.").

If the district court had determined the mix—either the results of the testing of the clothing or the results of all the postconviction DNA tests—was inconclusive, K.S.A. 21-2512(f)(3) would require Haddock to prove "by a preponderance of the evidence that there is a substantial question of innocence." No party asks us to apply this standard, and the district court did not use this standard. Consequently, we will not analyze this case by considering this standard or resolve the potential ambiguity in K.S.A. 21-2512(f)(3).

We are left to consider whether the results of the postconviction DNA tests under the first motion, under the second motion, or

under a mix of the two are favorable or unfavorable. Haddock argues all results are favorable and suggests the district court failed to follow the mandate of *Haddock II* because it imposed an exoneration standard in determining if a new trial should be granted. According to Haddock, this means that on this basis alone we must reverse the district court.

*Did the District Court Follow the Mandate of This Court's Remand Order?*

As Haddock argues, the *Haddock II* court explained that the "DNA results need not be completely exonerating in order to be considered favorable. [Citation omitted.]" *Haddock II*, 282 Kan. at 501. In reaching this conclusion, the court looked to *State v. Buckman*, 267 Neb. 505, 515-17, 675 N.W.2d 372 (2004). In *Buckman*, the Nebraska Supreme Court stated: "Once DNA testing is conducted, and results are obtained, the question is whether the evidence obtained exonerates or exculpates the movant." *Buckman*, 267 Neb. at 515. Discussing *Buckman*, the *Haddock II* court further explained that in some cases "DNA may not conclusively establish guilt or innocence but may have significant probative value to a finder of fact." *Haddock II*, 282 Kan. at 495 (citing *Buckman*, 267 Neb. at 515-16). In a circumstance where the evidence obtained is merely exculpatory, rather than exonerating, a new trial is a "lesser but still effective remedy" as compared to an order vacating the petitioner's conviction. *Buckman*, 267 Neb. at 517. This court recently reaffirmed that "[t]o be 'favorable,' the test result need not completely exonerate the petitioner." *Goldsmith*, 292 Kan. at 402 (citing *Haddock II*, 282 Kan. at 501).

If test results need not be exonerating to be "favorable," they likewise need not be exonerating to warrant a new trial. As the *Buckman* court recognized, there would be no need for a new trial if the DNA results were truly exonerating because the conviction would likely be vacated. Hence, exoneration is not the touchstone for granting a new trial.

Nonetheless, the district court in this case discussed an exoneration standard when orally denying Haddock's motions for new trial, stating, "Analysis of those items [the hair, fingernail scrapings,

and eyeglasses] did not exonerate . . . Mr. Haddock, and [defense counsel] agreed that exoneration be proved [*sic*] here. And I think the Supreme Court . . . considers it to be favorable facts from those items." The parties reach different conclusions regarding the meaning of these statements.

As we examine the meaning of the district court's conclusions, we begin by accepting that the court made a factually supported conclusion: It is true that the DNA testing of the hair, fingernail scrapings, and eyeglasses did not exonerate Haddock. Nevertheless, the statement that the evidence did not exonerate Haddock is troubling because, when read in isolation, it could be construed to require exoneration and because the next statement—Haddock and his defense counsel agreed exoneration had to be established— is incorrect. Defense counsel actually argued that "[t]he petitioner is not required to show that this evidence proves him innocent."

Nevertheless, the State argues this one statement made by the district court regarding exoneration cannot be read in isolation and, when read in context, was simply a starting point for the district court's analysis. We agree. Had the district court intended exoneration to be the ultimate test, the district court would have dismissed Haddock's motions for new trial based on that finding alone because it would mean the test results were unfavorable. See K.S.A. 21-2512(f)(1) (if the results of the DNA testing are unfavorable, district court "shall" dismiss the petition); *Denney*, 283 Kan. at 789 (K.S.A. 21-2512[f][1] clearly expresses legislative intent and requires no other action, "*e.g.*, no hearing, no presentation of witnesses, [and] no cross-examination" if DNA testing is unfavorable.). But the district court did not dismiss the motions and instead made additional findings and conclusions after noting that this court had determined some of the test results were favorable. Thus, the district court acknowledged this court's discussion in *Haddock II*, in which we repeatedly referred to the DNA results as favorable or partially favorable and in which we provided the following directions to the district court:

"As the favorable DNA results in this case are not conclusively exonerating, the district court must determine whether to order a new trial, or, in its discretion, enter some other order in the interests of justice. . . . [I]n considering whether to

grant a new trial based on this favorable evidence, the district court must consider whether the 'evidence . . . [is] of such materiality that a reasonable probability exists that it would result in a different outcome at trial.' [Citations omitted.]" *Haddock II*, 282 Kan. at 502.

While the district court did not specifically cite the *Haddock II* court's direction to apply this standard, immediately after noting that this court held the test results were favorable, the district court discussed the "overwhelming" evidence against Haddock. In this part of the ruling, the district court focused on the orchestrated crime scene and the improbability that a third party would have used the wood pile in an attempt to make Barbara's death appear to be an accident. The court termed this as "powerful" circumstantial evidence against Haddock. The district court then discussed the blood evidence, which the court found to be unfavorable and inculpatory.

Next, the district court referred to the "new" evidence, a term which encompasses all of the postconviction DNA testing results. The district judge concluded, "I have to look and see whether this new evidence, this new DNA evidence would in any way impeach the verdict; is it material enough in that there would be a different outcome possible. I say no." A few sentences later, the district judge held, "[T]here is no reasonable probability I think that the outcome of the trial would be any different if another jury were selected to hear this case again. There [are] just too many facts here that can't be overlooked."

In other words, while the district court's reference to exoneration was ambiguous, overall the oral statements of the district judge indicate he did not ignore the mandate of *Haddock II* and in fact applied the test outlined for determining whether favorable postconviction DNA test results mean a new trial should have been granted.

This conclusion is further reinforced by the district court's incorporation of the State's proposed findings of fact and conclusions of law into the order. Those proposed conclusions included statements that the postconviction DNA testing arising out of the first motion—the testing of the hair, eyeglasses, and fingernail scrapings—did "help [Haddock] to a small degree," but the overwhelm-

ing evidence at trial and the new test results with regard to the pants, shoes, and shirt led to the court's conclusion that the DNA test results under Haddock's first motion were "not of such materiality that a reasonable probability exists that it would result in a different outcome at trial."

The district court's incorporation of the State's proposed findings of fact and conclusions of law and the general tenor of the district court's findings and conclusions indicate the district court considered the entire record and all of the DNA evidence before concluding there was not a reasonable probability of a different outcome. Hence, we conclude the district court did not ignore our instructions on remand.

We next turn to whether the district court erred in ruling that the evidence was not of such materiality that a reasonable probability exists that it would result in a different outcome at trial. Before reaching the substance of that issue, however, we must resolve a dispute between the parties regarding the appropriate standard of review the district court should have used and the standard that applies to our review of the district court's order.

*Materiality—District Court Standard and Appellate Standard of Review*

Haddock asserts the district court "entirely discounted the favorable evidence with the 'unfavorable' evidence from the second round of testing without any consideration of the effect of the testing results on the evidence as adduced at trial" and its "absolute failure to apply the materiality standard to the favorable results [was] erroneous." Regarding this court's review of this portion of the district court's ruling, Haddock asserts a question of materiality presents a mixed question of law and fact over which this court has de novo review.

The State, on the other hand, asserts the standard of appellate review depends on whether the district court's factual findings concerning the DNA evidence are favorable or unfavorable. The State maintains this court clearly set forth in *Haddock II* that an abuse of discretion standard applies to the district court's determination of whether to grant a new trial based on the favorable evidence.

The State, however, argues that a negative finding standard applies to the district court's finding that the DNA test results under the second motion were unfavorable and to the conclusion that a new trial was not warranted.

As the State maintains, this court clearly set forth in *Haddock II* the standard of review to be applied when the question presented is whether a new trial must be granted based on favorable evidence: "[J]ust as an order granting a new trial under K.S.A. 22-3501(1) is subject to an abuse of discretion, the standard of appellate review of a trial court's order under K.S.A. 2005 Supp. 21-2512 is whether the trial court abused its discretion." *Haddock II*, 282 Kan. at 499 (citing *State v. Adams*, 280 Kan. 494, 501, 124 P.3d 19 [2005], *disapproved on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 [2012]). In *Adams*, we stated: "A decision [regarding a motion for new trial] will not be reversed on appeal 'if a reasonable person could agree with the district court's decision.'" *Adams*, 280 Kan. at 501 (quoting *State v. Moncla*, 273 Kan. 856, 861, 46 P.3d 1162 [2002]).

After our decision in *Haddock II*, we refined our abuse of discretion standard of review by differentiating three ways in which a district court can abuse its discretion. First, a district court abuses its discretion if a decision is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the district court. This is the standard applied in *Adams* to the appellate review of a district court's ruling on a motion for new trial. Second, a district court abuses its discretion if its decision is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion. Third, a district court abuses its discretion if a decision is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). We further noted that "this three-part standard may narrow the broad discretion previously allowed when this court routinely applied only the no-reasonable-person-would-take-the-same-view standard." *Ward*, 292 Kan. at 550-51.

Even more recently, in *Warrior*, we applied this three-prong standard to our review of a district court's determination that a defendant was not entitled to a new trial even though the State failed in its affirmative duty to disclose evidence favorable to the defendant as required under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); see *Warrior*, 294 Kan. at 505-10. Under *Brady*, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' [Citations omitted.]" *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). This standard is strikingly similar to the test we directed the district court to use on remand in this case, stating: "[I]n considering whether to grant a new trial based on this favorable evidence, the district court must consider whether the 'evidence . . . [is] of such materiality that a reasonable probability exists that it would result in a different outcome at trial.' [Citations omitted.]" *Haddock II*, 282 Kan. at 502.

In *Warrior*, after recognizing that we have traditionally applied an abuse of discretion standard when conducting a *Brady* analysis, we considered which of the three differentiated standards under our new abuse of discretion framework might apply. We noted that materiality had traditionally been reviewed as an issue of law regardless of the context in which the issue arose and a decision to grant a new trial had traditionally been considered under the no-reasonable-person-would-agree standard. After discussion of various cases, we concluded the determination of materiality is reviewed de novo with deference to a district court's findings of fact, but the district court's denial of the defendant's motion for new trial is reviewed under the traditional abuse of discretion standard. *Warrior*, 294 Kan. at 505-10.

As applied to the standard we stated in *Haddock II*, we conclude this means that a de novo standard applies to the determination of whether the evidence was material. Materiality is explicitly incorporated into the new trial standard imposed in *Haddock II*. We also conclude that materiality is a component of the determination of whether the postconviction DNA test results would have pro-

bative value to a finder of fact, a test we mentioned in *Haddock II* when discussing the categorization of evidence as favorable or unfavorable under K.S.A. 21-2512(f)(2). *Haddock II*, 282 Kan. at 495. Hence, we will conduct a de novo review of the determination of whether the evidence has favorable probative value, giving deference to the district court's factual findings. Consistent with Kansas' long-standing standard, we will determine if a reasonable person would agree with the district court's decision regarding whether the postconviction DNA test results were not of *such* materiality that a reasonable probability exists that it would result in a different outcome at trial.

Arguably, the same standard could apply to a determination of whether evidence is unfavorable to a defendant. But the State suggests we should apply the negative finding standard of review. Generally, " 'a negative finding that a party did not carry its requisite burden of proof will not be disturbed on appeal absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice.' " *Dalmasso v. Dalmasso*, 269 Kan. 752, 758, 9 P.3d 551 (2000) (quoting *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 275, 864 P.2d 1148 [1993]); see *143rd Street Investors v. Board of Johnson County Comm'rs*, 292 Kan. 690, 720, 259 P.3d 644 (2011). This standard is highly deferential, but it has not been "actually applied to undermine the de novo, independent review of legal questions with which appellate courts are properly imbued." *State v. Marx*, 289 Kan. 657, 661, 215 P.3d 601 (2009). Here, as we have held, the determination of materiality as it relates to an assessment of the favorability or unfavorability of evidence is a question of law. Consequently, at least as to the initial review of whether the results of the DNA testing were material to a determination that the DNA testing was favorable or unfavorable, the negative finding standard of review does not apply.

In examining materiality under K.S.A. 21-2512, Haddock suggests we should look to caselaw applying the *Brady* test and, specifically, to the guidelines outlined by the United States Supreme Court in *Kyles*, 514 U.S. 419. In response, the State argues, in part,

that the *Kyles* standard has no place in this appeal that has not been pursued as a *Brady* violation.

The State's argument is supported by *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009), in which the United States Supreme Court rejected a state court's decision that *Brady* applied to a defendant's postconviction attempt to obtain DNA testing. The Supreme Court held, in part, that a convicted person's "right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* is the wrong framework." *Osborne*, 557 U.S. at 69. Hence, from a constitutional due process standpoint, each state is able to determine the procedure it will apply to provide postconviction relief, as long as the procedure is fundamentally adequate to vindicate the substantive rights of those wrongfully convicted. *Osborne*, 557 U.S. at 69. Also, it is important to note that Haddock has not asserted *Brady* or due process rights in this appeal.

Nevertheless, Kansas courts apply a standard that, as we have discussed, mirrors the *Brady* standard, at least when considering whether to grant a new trial such as is requested in this case. See *Haddock II*, 282 Kan. at 499 ("[O]ne such order 'in the interest of justice' is an order for a new trial. In order to grant such an order, the 'evidence must be of such materiality that a reasonable probability exists that it would result in a different outcome at trial.' "). Consequently, the United States Supreme Court's guidance in *Kyles* may have at least some nonbinding application.

In discussing the materiality test, the *Kyles* Court emphasized four points. First, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Second, materiality is not a sufficiency of evidence test. Third, once a reviewing court has found constitutional error, there is no need for further harmless-error review because the constitutional standard for materiality imposes a higher burden than the harmless-error standard of *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.

Ct. 1710, 123 L. Ed. 2d 353 (1993). Fourth, the State's disclosure obligation turns on the cumulative effect of all suppressed evidence favorable to the defense, not on the evidence considered item by item. *Kyles*, 514 U.S. at 434-39.

Haddock does not seek application of the first or third points. We, therefore, express no opinion regarding whether those points apply to an analysis under K.S.A. 21-2512. Haddock does argue for application of the *Kyles* Court's second and fourth points.

In the second point, the Court indicated the materiality test is not a " 'sufficiency of the evidence' " test. In other words, a "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35. The Court explained that "[o]ne does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. At least as to the test that applies in Kansas to a motion for new trial based on new evidence, the *Kyles* second point is consistent with determining whether there is a reasonable probability the new evidence would have led to a different result. See *State v. Thomas*, 257 Kan. 228, 235, 891 P.2d 417 (1995) (party seeking new trial based on new evidence bears the burden of bringing forward new evidence and establishing that the new evidence is "sufficiently credible, substantial, and material to raise in the court's mind, in light of all the evidence introduced at the original trial, a reasonable probability of a different outcome upon retrial").

We also agree with the fourth and final point in *Kyles*, which was that the potential impact of the evidence should not be examined piece by piece but should be examined as a whole and in light of the entire record. This test was explained by the United States Supreme Court in another case, *House v. Bell*, 547 U.S. 518, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006):

"[A] court must consider ' "all the evidence," ' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' [Citations omitted.] Based on

this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.' [Citation omitted.] The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors. [Citation omitted.]" *House*, 547 U.S. at 538.

The Court later repeated and emphasized that a court's examination of postconviction DNA testing "requires a holistic judgment about ' "all the evidence," ' [citations omitted], and its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539.

With this standard in mind, we consider how this standard was applied to Haddock's two motions.

*Shoes, Shirt, and Pants—Favorable or Unfavorable?*

We begin with the question of whether the district court erred when it ruled the postconviction DNA testing of the shoes, shirt, and pants was "not favorable."

Haddock argues the postconviction testing of the sample taken from the shoes was favorable to him because the results provided a basis to question two aspects of the evidence at trial. During the trial, there was evidence a shoe sample tested positive for blood and was consistent with Barbara's DNA and inconsistent with Haddock's. Postconviction testing established that the sample was only presumptively, not conclusively, blood and that the DNA was a mix of Barbara's and Haddock's. As to the blood on the shirt, Haddock similarly argues Wraxall's testimony was that the spots were only presumptively blood. Additionally, Haddock argues that locating blood above the cuff was favorable. This argument is explained in Haddock's brief to this court, as follows:

"This Court should find Mr. Wraxall's results to be favorable to Mr. Haddock. In order to rationalize why a person who had supposedly just committed a bloody murder and orchestrated the crime scene would leave the clothes he was wearing at the scene, the prosecution argued that Mr. Haddock was wearing a sweater at the time of the murder and therefore didn't know that blood had gotten onto the cuff of the shirt he was wearing underneath. This was the State's theory as to why Mr. Haddock would have left the shirt he was wearing at the time of the murder in the laundry room."

As to the pants, Haddock argues that because the clothing was presented as a "package" during trial, a package that was tied together by the spatter evidence, the evidence relating to the shoes also undercuts the evidence relating to the pants.

In conducting our de novo review of materiality, we agree with Haddock's argument that some aspects of Wraxall's testing and testimony are favorable to Haddock in that it means the evidence is somewhat weaker than presented at trial. Specifically, the testimony that emphasized the presumptive nature of the testing could be argued to create a reasonable doubt. Also, the finding of the additional spots of blood on the shirt adds weight to Haddock's argument that a person who had orchestrated a crime scene would not leave bloody clothes at the scene. These points could have probative value to a trier of fact. Hence, the district court erred to the extent it entirely discounted this evidence as unfavorable.

This error does not necessarily entitle Haddock to a reversal of the district court's ruling, however. As we have previously discussed, although the district court labeled the results as unfavorable, it did not dismiss the motion under K.S.A. 21-2512(f)(1). Instead, the district court examined *all* of the new DNA evidence—regarding the pants, shirt, shoes, hair, eyeglasses, and fingernail scrapings—and did so in a holistic sense of the entire record. Further, while the district court judge mentioned he still believed Haddock was guilty, the judge continued by applying the standard stated in *State v. Haddock*, 282 Kan. 475, 146 P.3d 187 (2006) (*Haddock II*), that applies when a petitioner seeks a new trial. Thus, ultimately the district court made a probabilistic determination about what reasonable, properly instructed jurors would do in light of all the new evidence and concluded there was a reasonable probability the jurors would still convict Haddock of murdering Barbara.

Hence, we are able to review the ultimate issue in this case even though we find the district court erred in its preliminary materiality/favorableness labeling. We reach this conclusion because, regardless of the label, reasonable people would agree that the minimal favorable impact of the clothing evidence was outweighed by the unfavorable impact of the results from the additional DNA

testing of these items. Further, reasonable people would agree with the district court that there was a reasonable probability that juror would convict Haddock even with *all* of the new evidence.

*Did the District Court Abuse Its Discretion in Refusing a New Trial?*

In determining if there was a reasonable probability that the new evidence would have changed the result of the trial, the district court noted that the blood evidence was inculpatory. Although we have noted that Wraxall's testimony weakened some aspects of the State's evidence, his testing implicated Haddock and was consistent with the State's blood spatter theory.

As to the point that the blood testing was presumptive, not conclusive, this point must be weighed against Wraxall's explanation that he puts the presumptive test together with finding DNA in a sample to confirm the sample is blood. Wraxall explained that false positives are usually caused by materials such as metal, leather, soil, or grime that do not contain DNA. Hence, while Wraxall's testimony would have allowed Haddock to stress the presumptive nature of the testing, as a whole his testimony supported the State's theory and left little room for doubt that Barbara's blood was found on Haddock's pants, shirt, and shoes.

Similarly, while Wraxall's testimony regarding additional blood spots on the shirt would have allowed Haddock to reinforce his argument that a scheming assailant would not have left clothes on the floor of the house, the evidence would not have drastically altered the parties' arguments. The additional spots were so faint they were even overlooked in pretrial testing; hence, it was reasonably probable a jury could conclude Haddock was unaware of the spots. Also, even if the jury relied on the sweater as an explanation for why Haddock believed he could leave the shirt behind, the sweater theory did not provide an explanation for leaving the pants. The jury had to resolve this question at trial. Finally, it is reasonable that a jury could conclude the sleeve of a sweater could have been pushed away from the wrist during an altercation and faint spots of blood could have fallen inches above the cuff. Contrary to Haddock's argument, the spots and the additional test re-

sults do not significantly alter any implication or theory presented to the jury.

Overall, as the district court found, Wraxall's testing confirmed that Barbara was the major DNA contributor to the spots found on the shoes, pants, and shirt. He placed the probability at 1 in 65 billion that it was her DNA on the shoe sample. Significantly, none of the postconviction DNA test results impacted the evidence that undercut Haddock's theory that blood had been dripped or smeared on his clothes—the lack of any other blood in the house, the nurse's testimony that the blood had coagulated and was not dripping, and the consistency of the spatter pattern. Finally, the postconviction testing does not establish that the spots on the clothing were not blood. See *State v. Bronson*, 267 Neb. 103, 114, 672 N.W.2d 244 (2003) (noting that even though DNA tests on what was claimed at trial to be a bloody fingerprint on a vase did not prove the substance to be human blood, "the DNA-tested evidence is not inconsistent with the evidence presented at trial which indicated that the substance likely was blood").

Regarding the eyeglasses, Haddock argues that the DNA test results provide physical evidence of the presence of unknown persons at the crime scene. This overstates the evidence, which at best establishes that an unknown person left DNA on the glasses at some point, not necessarily while at the crime scene. Still, it would have allowed Haddock to make the argument that there was evidence of a third person at the scene. Also, the lack of DNA from under Barbara's fingernails would have reinforced the argument made by defense counsel that the State had not presented physical evidence that she caused the scratches on Haddock's wrist. Neither of these postconviction DNA tests shifts the evidence at trial significantly, however. As previously noted, defense counsel had already pointed out the lack of DNA linking the scratches to Barbara, and there are multiple reasonable explanations for a third party's DNA being deposited on reading glasses that are more probable than having a murderer's DNA being deposited on only one item found at a murder scene. The only other third-party DNA evidence found in items located in the garage was on one of the hairs found

in Barbara's hand, which came from a woman, while the DNA from the glasses came from a man.

Without question, the postconviction DNA testing that is the most favorable to Haddock is the testing that established one of the hairs found in Barbara's hand came from a female and was not consistent with Barbara's DNA. Haddock argues he is entitled to a new trial because these results significantly weaken the State's case against him and require the State to develop a new "central theme." Haddock argues the State presented a new theory of "contamination" in the postconviction proceeding with regard to the hair and the district court inappropriately adopted this new theory.

We agree it is significant that the postconviction DNA evidence is inconsistent with the evidence presented at trial that the hair was Haddock's. Still, we conclude reasonable people could agree with the district court's assessment that this new evidence was not reasonably probable to change the outcome of the trial.

First, we note that the State's central theme, that there was a struggle between Barbara and her assailant, would not have changed. This theme was supported by the defensive injuries suffered by Barbara. Rather than changing the theme, the new evidence would have weakened the theme. Haddock is correct, however, that the State developed a posttrial explanation for the hair's presence that was not discussed at trial. Nevertheless, the presence of a reasonable explanation mitigates the potential impact of the evidence if there were a retrial, a consideration that can be made in making a probabilistic determination about what reasonable, properly instructed jurors would do.

Further, the evidence at trial left open the possibility the hair was Barbara's or that of a third party. Granted, the new evidence is more concrete and persuasive. Yet, it does not tilt the scales to a reasonable probability of a different outcome. As we previously quoted, defense counsel in closing argument noted the hair could be Barbara's and stressed there was a reasonable doubt as to whose hair was in her hand. Also, we note that contrary to Haddock's argument, when he was asked about the hair being his, the district court sustained an objection that the question was not consistent with the evidence. The objection and the district court's ruling

reinforced that the DNA testing did not conclusively establish that the hair was Haddock's.

Finally, although there is no doubt that the evidence of a hair with a root follicle that matched Haddock's DNA in Barbara's hand was significant evidence against Haddock, the presence of someone else's hair is not conclusive proof that someone else was the murderer. As the district court pointed out, the crime occurred in a garage and many individuals attempted to save Barbara prior to preservation of the crime scene.

Moreover, contrary to Haddock's argument, the State did not emphasize the presence of the hair during the trial. In fact, as to all of the DNA evidence, a comment made by the prosecutor during closing argument is telling. The prosecutor stated, "We know that is an orchestrated crime scene, absolutely no doubt about that." He then argued how the evidence supported this conclusion, and then stated, "This is probably better than DNA evidence in terms of your ability to narrow the scope." As noted by the United States Supreme Court: "Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent." *Osborne*, 557 U.S. at 62.

At trial and now, the State maintains that the key to the case is the orchestrated crime scene combined with evidence that only the family knew the wood pile had previously fallen, Haddock's insistence to police and his neighbors that the death was accidental and caused by the wood falling, and the movement of the car from the garage to the driveway after the beating. The other compelling evidence includes Haddock's reaction to the crime, the wood chips in his shoes, the timeline, and the blood spatter evidence, which postconviction DNA testing reaffirms was formed by Barbara's blood.

This situation stands in sharp contrast to the cases on which Haddock relies. Primarily, Haddock relies on *State v. Armstrong*, 283 Wis. 2d 639, 700 N.W.2d 98 (2005), which he maintains could just as easily describe his case.

In *Armstrong*, the defendant was convicted of first-degree sexual assault and first-degree murder. Postconviction DNA testing discredited nearly all of the physical evidence presented at trial, re-

vealing that the hairs found on the bathrobe draped over the victim's body were not the defendant's hairs, that the semen found on the victim's robe was not the defendant's semen, and that there was no indication that any blood found under the defendant's fingernails or on his toes was that of the victim. The Wisconsin Supreme Court noted that at trial the State "argued that the physical evidence 'conclusively' demonstrated that [the defendant] was the murderer." *Armstrong*, 283 Wis. 2d at 697. The court concluded: "The DNA evidence now excludes [defendant] as the donor of certain physical evidence that was relevant to the critical issue of identity; the jury did not hear this evidence, and the State used the physical evidence assertively and repetitively as affirmative proof of [defendant's] guilt." Thus, the court reversed the defendant's conviction and remanded the matter for a new trial. *Armstrong*, 283 Wis. 2d at 701.

Unlike the facts in *Armstrong*, here only one piece of physical evidence that was relied on at trial, the hair, was discredited through postconviction DNA testing. And, there is a significant amount of other evidence establishing Haddock's identity as the killer, unlike two other cases on which Haddock relies—*People v. Waters*, 328 Ill. App. 3d 117, 128-29, 764 N.E.2d 1194 (2002) (reversing and remanding conviction where the victim's identification of defendant was based on the act of him urinating on her but postconviction DNA testing excluded defendant as the source of the urine), and *Pers. Restraint of Bradford*, 140 Wash. App. 124, 132, 165 P.3d 31 (2007) (postconviction DNA testing revealed the presence of DNA from an unidentified male and not the defendant on the mask placed on the victim).

While the evidence that the hair and eyeglasses had the DNA of two unknown people—one male and one female—could be used to suggest others may have also been present when Barbara was murdered, that evidence does not dispute the overwhelming evidence of Haddock's guilt to which the State and district court point. See *Moore v. Com.*, 357 S.W.3d 470, 487-88 (Ky. 2011) ("[T]he other evidence of Appellant's guilt as recounted by the trial court undermines what little favorableness could be gleaned from the presence of another person's DNA.").

In light of the evidence adduced at trial and through Haddock's second motion for DNA testing, we conclude that a reasonable person could agree with the district court's ruling that it is not reasonably probable the postconviction DNA testing results would change the jury's verdict that Haddock premeditated the murder of Barbara. Consequently, we hold the district court did not err in denying Haddock's motions for new trial.

Affirmed.