NOT DESIGNATED FOR PUBLICATION

No. 121,039

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CRAIG L. GOOCH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed June 5, 2020. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., GARDNER, J. and WALKER, S.J.

PER CURIAM: Following Craig L. Gooch's convictions and multiple appeals, a panel of this court remanded this case to the district court to order postconviction DNA testing on Gooch's fingernail clippings and hand swabs. Test results revealed no DNA from the victim. After a hearing, the district court denied Gooch's motion for a new trial, finding there was not a reasonable probability of a different outcome at trial. Gooch now appeals, claiming the district court erred. After a careful review, we find no reversible error by the district court and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This is Gooch's fourth trek to our court. See *State v. Gooch*, No. 110,418, 2014 WL 5849227 (Kan. App. 2014) (unpublished opinion) (*Gooch I*); *State v. Gooch*, No. 114,886, 2017 WL 543451 (Kan. App. 2017) (unpublished opinion) (*Gooch II*); *State v. Gooch*, No. 116,960, 2017 WL 5951700 (Kan. App. 2017) (unpublished opinion) (*Gooch III*). Because previous panels have repeatedly trod this ground, the facts are largely taken from previous opinions.

"On May 11, 2012, then 32-year-old M.C.H. drove her gold minivan to the local Dillons grocery store at 8 a.m. She parked in the store's southwest parking lot, locked her minivan, and went inside the store. After M.C.H. purchased her groceries, she pushed them in a shopping cart out to her minivan. She unlocked the vehicle and put her groceries inside. She walked back inside the store to return her cart. M.C.H. then returned to her minivan and drove out of the parking lot.

"Less than one block away from the store, M.C.H. looked in her rearview mirror and saw a man, later identified as Gooch, in the back of her minivan. Seconds later, Gooch jumped in the front passenger seat and grabbed hold of M.C.H.'s ponytail. He told her to drive someplace where no one would see them because he was going to rape her. Gooch repeatedly told M.C.H. that he had a gun and that he would kill her. M.C.H. testified that she was frightened and did not know what to do. She was crying and asked Gooch not to hurt her. Gooch held M.C.H.'s ponytail so tightly that she could not turn her head to see if it was safe to cross an intersection. Though M.C.H. did not see a gun, she believed that Gooch had one.

"M.C.H. told Gooch that she did not know where to go. She told him that she did not live far away and that no one would be at her home. M.C.H. testified that she thought she might be able to convince Gooch to just take her vehicle, and she hoped that one of her neighbors would be outside and see that something was wrong. Gooch told M.C.H. that if anybody was at the house, he would kill her and everyone else present. As M.C.H. drove, Gooch kept a firm hold on her ponytail with one hand and began fondling her

2

breasts over her T-shirt with his other hand. He then put his hand inside of her sweatpants and underwear and began rubbing her vagina.

"When they arrived at the house, M.C.H. told Gooch to take her vehicle or whatever he wanted, but just not to hurt her. Gooch turned off the ignition and pulled the key out. M.C.H. thought about running if he let go of her, but she was afraid that Gooch would shoot her if she ran. Gooch reached over M.C.H., opened the driver's side door, and climbed out over her. He told M.C.H. to get out of the vehicle, act like nothing was wrong, and stop crying. As they walked up to the house, M.C.H. saw that none of her neighbors were outside.

"Gooch and M.C.H. entered the house and Gooch shut the door behind them. Gooch still had a hold on M.C.H.'s ponytail and pushed her over to the couch. M.C.H. was crying and asking Gooch not to 'do this.' Gooch pulled off M.C.H.'s shirt and unfastened her bra as she cried and tried to cover herself. He pushed her onto the couch and removed her sweatpants and underwear. Gooch held M.C.H.'s hair with one hand, and alternated between touching M.C.H.'s breasts and rubbing her vagina with the other. M.C.H. tried to keep her legs closed, but Gooch penetrated her vagina with his finger. Gooch became angry with M.C.H. for crying and hit her on the side of her head.

"Throughout the ordeal, Gooch continued to tell M.C.H. that he had a gun and would kill her. M.C.H. testified: 'He's just telling me how stupid I am, telling me I'm a stupid bitch, that I just went to the store to get groceries, that he was going to rape the shit out of me.' However, Gooch then told M.C.H. that he was not going to rape her, but was 'just going to nut on' her face. He pulled his erect penis out of his pants, pulled M.C.H. to the side of the couch, and began to masturbate. M.C.H. closed her eyes and was crying. Gooch ejaculated on M.C.H.'s face.

"After allowing M.C.H. to clean up and get dressed, Gooch told M.C.H. that she needed to drop him off at the store where she had picked him up. As they walked out of the house, Gooch let go of M.C.H.'s hair and put his arms around her as they walked toward the minivan. This time, one of M.C.H.'s neighbors, Santalena Caudillo, saw M.C.H. come out of the house with Gooch. Caudillo later testified that M.C.H. looked very ill, as though she were ready to vomit. Caudillo yelled out, 'Hey,' but M.C.H. did not

3

respond. Caudillo watched as Gooch opened the door to the minivan, M.C.H. got into the driver's seat, and Gooch climbed over her into the passenger seat. Caudillo approached the minivan, waiving her arms and calling out M.C.H.'s name. When M.C.H. drove away without acknowledging her, Caudillo ran to her home and called 911.

"M.C.H. drove Gooch back to the Dillons store where she had shopped earlier that morning. When M.C.H. pulled into the Dillons parking lot, she asked Gooch if he was going to get out. He told her to keep driving, so she went through the parking lot. Gooch instructed her to take several right turns and finally to stop when they reached an alley. Gooch asked, '[Y]ou're just going to go straight back and call the police, aren't you?' M.C.H. told him that she would not. Gooch told her that if she called the police, he would come back to kill her and her family. Before getting out of the van, Gooch went through M.C.H.'s purse and took $16 from her wallet.

"After Gooch got out of the vehicle, M.C.H. tried to watch him to see where he went. She did not know how long she sat there, but said it seemed like forever. The next thing M.C.H. remembered was being back at her house. When she pulled up in her driveway, M.C.H. saw Caudillo. M.C.H. was crying, and rolled down her window and waved Caudillo over to her car. Caudillo told M.C.H. that she had called the police and they were on their way. M.C.H. sat with Caudillo on her front porch until officers arrived. At times, M.C.H. was hysterical and her speech unintelligible as she tried to tell Caudillo what happened. At other times, she remained calm enough to describe the day's events.

"Law enforcement officers arrived on the scene quickly after receiving Caudillo's report of a possible kidnapping. M.C.H. underwent a sexual assault examination at a local hospital. The sexual assault nurse examiner (SANE) collected swabs from M.C.H.'s face and neck, which later were submitted to the Kansas Bureau of Investigation (KBI) lab for DNA testing. M.C.H. told the SANE that the side of her head was very tender from being struck. When she pulled her hair back, quite a bit of hair came out in her fingers. The soreness to M.C.H.'s head lasted several days.

"Police detectives secured M.C.H.'s home and began collecting potential evidence. They observed a stain on the arm cushion of the couch that appeared to be semen, so they collected the entire arm cushion to submit for forensic analysis. Other

4

detectives went to the Dillons where M.C.H. had shopped that morning and began reviewing the store's surveillance video. The video footage confirmed that Gooch had walked from a house near the store and purchased a package of cigarettes at 7:57 a.m. Gooch left the store at 7:59 a.m. and walked back to the house. He returned to the Dillons parking lot at 8:09 a.m. Gooch first approached another woman, later identified as Lindsay Magallanes, as she was loading her minivan. Magallanes later testified that she did not know Gooch and had not invited him over to chat. At 8:15 a.m., Magallanes told Gooch that she had to go inside the store to pick up a cake, at which point he walked away. After Magallanes went inside the store, Gooch unsuccessfully attempted to open the doors of her vehicle.

"The video footage showed that at 8:19 a.m., M.C.H. had walked out to the parking lot and was unloading her groceries in her minivan. At 8:20 a.m., as M.C.H. pushed her shopping cart back inside the store, Gooch walked toward her minivan. At 8:20 a.m., the video showed a shadowy figure approaching M.C.H.'s minivan. The video showed the figure jump into the back seat through the minivan's hatchback. At 8:21 a.m., M.C.H. returned to her minivan, backed out of the parking stall, and exited the parking lot.

"Law enforcement officers were dispatched to the house from which the suspect depicted in the video had walked. The homeowner consented to a search, and police found Gooch sleeping in the front room. He was placed under arrest and taken to the police station. During an interview, Gooch gave detectives the false name of 'Dallas Maverick' and said that he lived everywhere. He said that he had gone to Dillons to purchase cigarettes and saw a 'home girl' who gave him a ride to another location to purchase crack cocaine. He denied having sexual contact with the 'home girl' and said he gave her crack cocaine in exchange for driving him to the drug deal. Gooch also denied going to M.C.H.'s house and said his bodily fluids would not be found on her couch.

"A KBI forensic biologist conducted DNA testing on the evidence submitted by law enforcement. The biologist located seminal fluid containing DNA on the arm cushion of M.C.H.'s couch and the swabbing taken from her neck that was consistent with a known sample of Gooch's DNA. The biologist testified that the statistical probability of the DNA coming from a person other than Gooch was 1 in 113 quintillion.

"*Procedural history*

"On May 14, 2012, the State charged Gooch with rape, a severity level 1 person felony; aggravated kidnapping, a severity level 1 person felony; aggravated robbery, a severity level 3 person felony; aggravated sexual battery, a severity level 5 person felony; aggravated burglary, a severity level 5 person felony; aggravated intimidation of a victim or witness, a severity level 6 person felony; criminal threat, a severity level 9 person felony; and interference with law enforcement, a severity level 9 nonperson felony. The district court appointed counsel to represent Gooch.

. . . .

"On January 22, 2013, the parties appeared before the district court for Gooch's jury trial. Before voir dire began, defense counsel raised several preliminary matters, including a request for another continuance to allow Gooch to locate a witness in his defense, later identified as 'Curtis Prebble.' The State opposed a continuance, pointing out that the case had been set for trial three times previously and the defense had sought a continuance each time. This time, the district court denied defense counsel's request for a continuance, finding there was no indication when and if Prebble would be found.

"At Gooch's jury trial, the State called M.C.H., various law enforcement officers who investigated the case, the nurse who conducted M.C.H.'s sexual assault examination, and the KBI forensic biologist who tested the physical evidence submitted by police. Gooch testified on his own behalf and his description of the events differed significantly from M.C.H.'s. Gooch testified that after a night of celebrating, he ended up sleeping on the couch at a friend's house. When he woke up, he walked to a nearby Dillons store to buy cigarettes. He returned to his friend's house and slept a little longer until he awoke to the sound of his friend's phone ringing. Gooch answered the phone and spoke to a woman interested in buying drugs. He made arrangements to meet the woman in the parking lot of the Dillons store. The woman told Gooch that she would be driving a gold-colored van, and he told the woman he would be wearing a black and red shirt.

"Gooch returned to the Dillons store and saw M.C.H. leave the store with a shopping cart of groceries. M.C.H. loaded the groceries into a gold-colored minivan and

6

walked back to the store to return her cart. Gooch testified that as M.C.H. walked by, she told him to get in her vehicle. Gooch walked to M.C.H.'s minivan and climbed into the back seat through the side door. M.C.H. returned to the vehicle and exited the parking lot. As they drove, M.C.H. told Gooch that she had spent more money at the grocery store than she had planned, and thus did not have enough to pay for the drugs. She told him that she had more money at her house. Gooch asked M.C.H. if she would first drive him to the house of his friend, Prebble, to pick up his belongings. M.C.H. agreed. After Gooch had collected his things at Prebble's house, M.C.H. drove him to her house.

"When they arrived, Gooch asked if he could come inside the house for a glass of water. Inside the house, M.C.H. found $6 or $7 and stated that was all the money she had to pay for the drugs. Gooch told her that she could make up the balance by performing oral sex on him, and she consented to do so. M.C.H. asked Gooch not to ejaculate in her mouth, so he ejaculated on her face instead. After the act was complete, M.C.H. went to the bathroom to wash up. When she returned, Gooch was preparing half a gram of crack cocaine for her. M.C.H, looked at the crack with surprise, and told Gooch that she wanted methamphetamine. Gooch did not have any methamphetamine, but told M.C.H. that he could get her some later that day. M.C.H. was angry, but Gooch assured her that if she called him later, he would make it right. M.C.H. drove him back to the area by Dillons and dropped him off at his friend's house where he had spent the night.

"After hearing all the evidence, the jury found Gooch guilty of all counts. The district court sentenced him to a controlling prison term of 712 months. Gooch timely appealed his conviction." *Gooch I*, 2014 WL 5849227, at *1-5.

The *Gooch I* panel remanded the case to the district court to hold a hearing on Gooch's request for new counsel because the district court did not properly investigate a potential conflict between Gooch and his attorney. 2014 WL 5849227, at *8-9. The panel affirmed the district court on Gooch's other contentions. 2014 WL 5849227, at *9-13.

On remand, the district court held a hearing and denied Gooch's request for new counsel. Gooch appealed, and a panel of this court affirmed the district court. *Gooch II*, 2017 WL 543451, at *3.

While Gooch's petition for review in *Gooch II* was pending before the Kansas Supreme Court, he filed a pro se petition in the district court under K.S.A. 21-2512 for postconviction DNA testing of his fingernail clippings and cotton swabs taken of his hands. During a nonevidentiary hearing, the district court summarily denied Gooch's motion, "reasoning that the evidence would not change the verdict in light of the overwhelming evidence presented against him." *Gooch III*, 2017 WL 5951700, at *2. Gooch appealed, and a panel of this court reversed, directing the district court to order DNA testing. 2017 WL 5951700, at *4.

DNA testing was performed. M.H.'s DNA was not present on the clippings or swabs. Based on those results, Gooch sought a new trial. Gooch argued the DNA results were favorable and material. The State responded the DNA testing results were not favorable, and both parties agreed to submit their arguments on their briefs.

On March 26, 2019, the district court issued its order denying Gooch's motion for a new trial. The district court found the DNA test results were favorable to Gooch but noted it had previously found the evidence supporting Gooch's conviction overwhelming and had reviewed the jury trial transcript and clearly remembered the trial. The district court found the evidence corroborated M.H.'s testimony, while Gooch's testimony contradicted all the evidence. Ultimately, the district court found the lack of M.H.'s DNA on the fingernail clippings and hand swabs was not of such materiality that a reasonable probability existed that a different outcome would result at trial.

Gooch timely appeals the denial of his request for a new trial.

## DID THE DISTRICT COURT ERR IN DENYING GOOCH'S MOTION FOR A NEW TRIAL?

Gooch argues the district court erred in finding no reasonable probability a new trial would result in a different outcome following favorable postconviction DNA test results. First, Gooch argues the district court committed legal errors because it relied on dicta from the Court of Appeals taken out of context to conclude the evidence against Gooch was overwhelming. Second, Gooch asserts the district court made factual errors because it found Gooch's testimony contradicted all the evidence in the case and ignored the evidence corroborating Gooch's testimony. Finally, Gooch claims those reasons also support a finding that no reasonable person would have determined the new DNA evidence was insufficient to raise a reasonable probability that a new trial would yield different results. The State responds that the record supports the district court's findings and the new DNA evidence did not raise a reasonable probability of different results because the evidence presented at trial was overwhelming.

*Standard of Review*

We review a district court's decision whether to grant a new trial or other relief under K.S.A. 2019 Supp. 21-2512(f) for abuse of discretion. *State v. LaPointe*, 309 Kan. 299, 306, 434 P.3d 850 (2019). Abuse of discretion exists when the district court's action (1) is one where no reasonable person would take the view adopted by the district court; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Woodring*, 309 Kan. 379, 380, 435 P.3d 54 (2019). The party asserting an abuse of discretion bears the burden of demonstrating such an abuse exists. See *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). When evaluating the district court's factual findings, we do not reweigh the evidence or assess witness credibility. *Woodring*, 309 Kan. at 380.

*Analysis*

K.S.A. 2019 Supp. 21-2512(f)(2) directs the steps a district court should take following postconviction DNA testing, if the results are favorable:

"If the results of DNA testing conducted under this section are favorable to the petitioner and are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at a trial or sentencing, the court shall:

"(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

"(B) enter any order that serves the interests of justice, including, but not limited to, an order:

(i) Vacating and setting aside the judgment;

(ii) discharging the petitioner if the petitioner is in custody;

(iii) resentencing the petitioner; or

(iv) granting a new trial."

"Applying its plain language, this provision means favorable testing alone does not mean the district court must grant a defendant affirmative relief." *LaPointe*, 309 Kan. at 305. Instead, a movant must establish "(1) the postconviction DNA test results are favorable and (2) the new DNA '"evidence . . . [is] of such a materiality that a reasonable probability exists that it would result in a different outcome at trial. [Citations omitted.]"'" *Haddock v. State*, 295 Kan. 738, 756-57, 286 P.3d 837 (2012) (*Haddock III*). The district court should examine the potential impact of the evidence as a whole and in light of "'"all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it

10

would necessarily be admitted . . . "at trial."'" *Haddock III*, 295 Kan. at 767 (quoting *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 [2006]).

M.H.'s DNA was absent from the DNA testing of Gooch's fingernail clippings and hand swabs. The district court found this result favorable to Gooch. But, as Gooch acknowledges, the district court also must find the results "are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at a trial" before it must order a new trial or another form of relief required by K.S.A. 2019 Supp. 21-2512(f)(2). Here, the district court found the DNA evidence from the fingernail clippings and hand swabs "was not of such materiality that a reasonable probability exists that a different outcome would result at trial." The State does not dispute the district court's finding that the DNA evidence was favorable toward Gooch. Thus, the issue on appeal is whether the district court erred in finding there was not a reasonable probability the DNA evidence would result in a different outcome at trial.

In the context of postconviction DNA testing, reasonable probability is "'a probability sufficient to undermine the confidence of the outcome.'" *State v. Rodriguez*, 302 Kan. 85, 93, 350 P.3d 1083 (2015). The district court must make "'a probabilistic determination about the likely impact of the new evidence on reasonable, properly instructed jurors.'" 302 Kan. at 94; *Haddock III*, 295 Kan. 738, Syl. ¶ 6. The standard to grant a new trial under K.S.A. 2019 Supp. 21-2512(f)(2) is like the standard for granting a new trial based upon newly discovered evidence, minus the time limit and requirement that the evidence be newly discovered. *Haddock v. State*, 282 Kan. 475, 499, 146 P.3d 187 (2006) (*Haddock II*).

Gooch claims the district court abused its discretion by making legal and factual errors and by rendering a decision with which no reasonable person would agree.

11

A.      *Errors of Law*

A district court abuses its discretion when guided by erroneous legal conclusions. "[E]ven under the deferential abuse of discretion standard of review, an appellate court has unlimited review of legal conclusions upon which a district court's discretionary decision is based." *State v. Ernesti*, 291 Kan. 54, 65, 239 P.3d 40 (2010).

Gooch argues the district court committed legal error in two ways:  (1) The district court did not consider the impact the newly discovered evidence would have on properly instructed jurors but simply made a credibility determination prior to the material's testing; and (2) the district court erroneously relied on dicta taken out of context from our court's prior opinions to determine the evidence was overwhelming.

First, Gooch alleges the district court did not consider the impact the new evidence would have on properly instructed jurors. However, in its order, the district court stated, "Just because the DNA of the victim was not located does not mean digital penetration did not occur. The Defendant may have cleaned himself prior to being apprehended, or simply the fact DNA results are not always obtained due to any number of factors." The district court found its review of the record and its memory of the trial showed overwhelming evidence against Gooch. It specifically noted the Dillon's videos and Caudillo's testimony and considered the impact of the new DNA evidence. The record supports this assertion. There is no evidence the district court committed a legal error by not considering the impact of the new evidence on properly instructed jurors.

Second, the district court twice stated our court referred to the evidence as overwhelming. Gooch claims the district court took this from our court's discussion in *Gooch I* of prosecutorial misconduct regarding whether Gooch's ejaculating on M.H.'s face could constitute bodily harm. Gooch is correct that the only discussion of overwhelming evidence on direct appeal is on prosecutorial misconduct. See 2014 WL

12

5849227, at *13. But in *Gooch III*, the panel referred to the evidence in this case as overwhelming when ordering the district court to order DNA testing. 2017 WL 5951700, at *4. Additionally, Gooch overlooks the fact that after each time the district court mentioned the Court of Appeals, it stated it also had found—and continued to find—the evidence overwhelming based on the record and its ability to witness the trial live. Moreover, Gooch's testimony was contradicted by M.H.'s testimony and other evidence submitted at trial, while several witnesses corroborated M.H.'s testimony. The district court's fleeting mentions of our court referring to the evidence as overwhelming is not an error of law. Gooch tries to persuade us the district court took our court's statements out of context, but Gooch fails to keep the district court's statement within its context. The district court's order mainly focused on its determination that the evidence was overwhelming. This determination was not an error of law.

B.    *Errors of Fact*

A district court abuses its discretion by making a factual error when substantial competent evidence does not support its factual finding on which a legal conclusion or exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).

Gooch raises several points to support his contention the district court made factual errors. He first takes issue with the district court's description of his defense when it summarily denied his request for postconviction DNA testing. *Gooch III* addressed that decision, and it is not relevant to the argument here. Each of Gooch's points go toward his ultimate point of the district court's determination that Gooch's testimony contradicted all the evidence in this case.

First, Gooch argues Magallanes' testimony supported his claim he went to Dillon's to complete a drug deal. He relies on her testimony that Gooch approached her and asked

if she was who he was looking for or if she needed anything, and Gooch testified the reason he attempted to enter Magallanes' van was to steal an iPad or iPod she left on her seat because he was frustrated that he was waiting at Dillon's to sell drugs. Magallanes testified she did not have an iPad, iPod, or other electronic device on a seat in her van. Although part of Magallanes' testimony is similar to Gooch's, their testimonies are still contradictory.

Next, Gooch asserts the forensic evidence corroborates his testimony that M.H. agreed to oral sex to complete the drug deal. Gooch argues his sperm on the upholstery of M.H.'s couch and M.H.'s neck and the absence of his sperm from the swabs of her vagina corroborate his theory of consensual oral sex. But the forensic evidence Gooch mentions does not prove either consent or lack thereof. It only proves Gooch ejaculated on M.H. in her house. Moreover, M.H. testified the oral sex was not consensual, and three witnesses testified M.H. told them the oral sex was nonconsensual shortly after it occurred. Gooch's claim that the SANE nurse testified there was no injury to M.H.'s vagina ignores her testimony that a lack of injury is common for digital penetration.

Gooch also argues the district court erred by not considering Curtis Prebble's proffered testimony. According to Gooch and to Prebble's unnotarized proffer of evidence, Prebble would have testified that Gooch stopped by his house to retrieve his belongings while a woman in a gold van waited for him. Before his trial, Gooch could not find Prebble, and the district court denied a continuance to find him. Upon release from the Department of Corrections, Prebble did not report for inpatient treatment, and a warrant was issued for his arrest. The district court observed it was unlikely Prebble would come to a courtroom when he was "on the run from the law." The panel affirmed the district court's denial of the continuance because of the low probability Prebble would appear at a later trial date given his absconding from parole and the arrest warrant. *Gooch I*, 2014 WL 5849227, at *10. Gooch now claims the district court should have considered this testimony because the impact of the new evidence must be considered in

14

light of all the evidence, old and new, without regard to its admissibility. However, we need not consider whether this additional testimony would tip the scales in Gooch's favor because Gooch provides no evidence Prebble would actually testify.

Finally, Gooch argues the district court committed an error of fact because the lack of M.H.'s DNA on Gooch's hands and fingernails shows the district court's statement that the evidence is contrary to Gooch's testimony is "false." While the lack of M.H.'s DNA on Gooch's hands and fingernail clippings could support his testimony that no digital penetration occurred, it must be viewed in light of the entire record. See *Haddock III*, 295 Kan. at 767. The State's forensic expert testified he did not originally test the hand swabs or fingernail clippings because there could be a low probability of producing a good DNA profile. The forensic expert offered several reasons why there might not be DNA found on a person's hands, such as shaking hands with others, sweating, or washing them. Additionally, M.H.'s testimony contradicted Gooch's testimony, and three witnesses testified M.H. told them shortly after the rape occurred that Gooch inserted his finger into her vagina.

Ultimately, the evidence in the record supports the district court's assertion that Gooch's testimony contradicted all the evidence in this case. Gooch first attempted to enter Magallanes' van but found it locked. He then waited for M.H. to reenter Dillon's and crawled into the back of her unlocked van. M.H. testified Gooch forced her to drive to a secluded spot so he could rape her. She also testified he inserted his finger into her vagina. After Gooch forced M.H. to drive him back to Dillon's, M.H. told her neighbor, a police officer, and the SANE nurse that Gooch raped her. None of the evidence admitted at trial or the new DNA test results contradict her testimony, but Gooch's testimony was contradicted at several turns. The district court's factual findings were supported by evidence in the record.

15

C.      *Unreasonable Decision*

Finally, Gooch reasons his arguments also support a finding that the district court abused its discretion because no reasonable person would have determined the new DNA evidence was insufficient to raise a reasonable probability that a new trial would yield different results. For the reasons we have already outlined above, we disagree.

The evidence against Gooch was overwhelming. M.H.'s testimony was supported by multiple witnesses who testified that M.H. told them she was raped shortly after it occurred. At trial, a forensic scientist testified for the State that testing of the vaginal swabs from M.H. excluded Gooch as a contributor of DNA and admitted he did not test Gooch's fingernail clippings because of the low probative value of testing fingernail clippings and hands. Evidence that Gooch's fingernail clippings and hands tested negative for M.H.'s DNA would have largely corroborated the forensic scientist's testimony and would be unlikely to alter the jury's determination. The jury had the opportunity to consider the lack of Gooch's DNA on the vaginal swabs and the State's decision not to test Gooch's fingernail clippings. A reasonable person could agree the new DNA evidence did not create a reasonable probability that a different result would have been reached at trial.

Affirmed.